825 A.2d 399

**COMPTROLLER OF THE TREASURY**

v.

**SYL, INC.**

**Comptroller of the Treasury**

v.

**Crown Cork & Seal Company (Delaware), Inc.**

**Nos. 76 & 80, Sept. Term, 2000.**

Court of Appeals of Maryland.

June 9, 2003.

Gerald Langbaum, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., John K. Barry, Asst. Atty. Gen., on brief), Annapolis, for appellant.

Robert J. Carson (Robert J. Carson, P.A., on brief), Daryl J. Sidle (Baxter, Baker, Sidle & Conn, P.A., on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

ELDRIDGE, J.

These cases concern the liability for Maryland income taxes of two corporations that do no business in Maryland, and own no tangible property in Maryland, but are subsidiaries of parents that do business in Maryland. The dispositive issue is whether there is a sufficient nexus between the State of Maryland and each subsidiary corporation so that the imposition of Maryland income tax does not violate either the Commerce Clause of the United States Constitution, Art. 1, Section 8, cl. 3, or principles of due process.

## I.

This opinion encompasses two cases; consequently, we shall set forth the facts of each case separately.

A. No. 76, *Comptroller of the Treasury v. SYL*

SYL, Inc. is a Delaware corporation and a wholly owned subsidiary of Syms, Inc. SYL owns intellectual property assets used by Syms, specifically trademarks, trade names and advertising slogans.[1] SYL's primary function is to manage and control these intellectual property assets. Syms is a New Jersey corporation that sells men's, women's and children's clothing in numerous states, including Maryland.

Syms incorporated SYL in December 1986, and upon its formation, Syms assigned the above-described intellectual property assets to SYL. In return, SYL granted to Syms a license to manufacture, use and sell the products covered by the trade names and trademarks in its business throughout the United States. In consideration for these intellectual property rights, Syms agreed to pay SYL a royalty based on the parent corporation's sales. At the same time that Syms created SYL, it also created another wholly owned subsidiary named SYI, Inc., the purpose of which was to give SYL investment advice.

For the tax years 1986 through 1993, SYL did not file corporate income tax returns in Maryland. Throughout this period, SYL did not own or lease tangible property in Maryland, had no employees in Maryland, and maintained no bank accounts in Maryland. Nor did SYL directly sell or lease goods or services in Maryland through advertising, mailings, or in-person solicitations. Syms, however, did have extensive business contacts in Maryland during this time period through its ownership and operation of retail stores in Maryland. Syms regularly filed Maryland corporate income tax returns.

In 1996, the Comptroller issued a Notice of Assessment to SYL, indicating that SYL owed for the years 1986 through 1993 an amount of $637,362 in corporate income taxes, including interest and penalties. SYL timely protested the Comptroller's Notice of Assessment. After a hearing, the

---

1. Hereafter in this opinion we shall use the term "trademarks" for all of the intellectual property assets.

Comptroller, by a hearing officer, issued a Notice of Final Determination that sustained the Notice of Assessment. The hearing officer, *inter alia*, found as follows:

"In general, the Comptroller's Office assessed SYL, Inc., a tax-haven entity earning substantial related party income, based on the position that SYL, Inc. ('SYL') was a phantom entity that did not have substantial economic substance. The Comptroller's audit section concluded that SYL's lack of substantial substance and its dependence on Syms Corporation ('Syms') for its earnings required SYL to file returns with Maryland based on the apportionment factor of its parent company Syms. The Comptroller's audit section relied upon *Comptroller v. Armco*, 82 Md.App. 429, 572 A.2d 562 (1990) (cert.denied); *Comptroller v. Atlantic Supply Co.*, 294 Md. 213, 448 A.2d 955 (1982). The Comptroller's Office believes these decisions are consistent with Tax–General Article, Section 10–402 which generally requires that the income reasonably and fairly attributable to carrying on business in Maryland be taxable by Maryland. In short, the Comptroller's section found SYL to be a phantom or bookkeeping entity and taxed it based on economic reality and the true source of its income."

\* \* \*

"In December, 1986, Syms incorporated SYL in Delaware and putatively assigned to SYL its ownership in trademarks. As part of an overall plan, SYL licensed back to Syms the trademarks and ostensibly assumed (at least on paper) all obligations for management and administration of the marks. Just as before the assignment and simultaneous license back of the marks, Syms continued to utilize the marks in its retail clothes stores in Maryland and other states. SYL charged Syms a 4% royalty pursuant to a license agreement which was apparently entered into on December 18, 1986 (though dated July 1986). The 4% royalties were charged from October 1, 1986 even though the formal assignment of the intangibles was not effectuated until December 19, 1986. Moreover, the valuation of the arm's length royalty rate was provided by a company which

was engaged by a consultant (Coventry Financial Corp.) which apparently was provided a financial stake in the tax savings obtained.

"At least one significant objective of forming SYL was to generate state income tax benefits. See memorandum of Karen Artz Ash dated July 22, 1986 at p. 6. See also Rosen, 'Use of a Delaware Holding Company To Save State Income Taxes', 20 *Tax Advisor* 180 (1989). Significant state income tax savings were generated from SYL in Maryland and other separate return states because (a) Syms deducted the substantial royalty payments of roughly $12 million each year to SYL and (b) SYL did not report its royalty income as taxable in Maryland or other separate return states other than Delaware. Since Delaware does not generally tax income from intangibles, SYL generated very substantial state income tax benefits. It appears from one document (finally obtained after repeated requests) that Syms paid a third party—Coventry Financial Corp.—a percentage of the early year state tax savings for its consulting efforts in setting up SYL. See the Richard Diamond to Sy Syms memorandum dated December 12, 1986 entitled 'State Income Tax Savings—Coventry Financial Corp.' "

\*    \*    \*

"While by no means exhaustive, I find some of the salient and controlling facts as follows:

"(1) SYL was a thinly constituted entity with very little if any true economic or operational activity in that:

"(a) It paid out very little in wages and the $1,200 or so of yearly wages paid were to employees of third party 'nexus service providers' which are in the business of providing tax-haven entities with 'apparent substance'. SYL contracted with one such 'nexus service provider' which provides mail forwarding, shared office space and shared employees for numerous other taxpayers. At least some nexus service providers promote their services to potential clients at tax seminars, and it is understood

that hundreds, if not thousands, of taxpayers enter into arrangements with these nexus service providers.

"(b) SYL had no separate office or employees other than the shared space and purported employees of nexus service providers and the officers of Syms who were compensated solely by Syms.

"(c) SYL had no phone listing, phone service or office signage.

"(d) SYL apparently did not license its marks (or attempt to license) to third parties.

"(e) SYL officers did not have business cards, job descriptions, job evaluations or other indicia of a true employment relationship.

"(f) Though requested, SYL could not produce invoices issued to Syms pursuant to the royalty agreement (beyond the initial billing period).

"(g) Though requested, SYL could not produce travel reports showing business activity in Delaware.

"(h) Though requested, SYL failed to produce a person at the informal hearing who could speak to any activities being conducted by SYL."

\*       \*       \*

"From a legal standpoint, it is difficult to find fault in the Comptroller's assessment. As in *Armco*, the Comptroller's Office appropriately determined that the factors and attributes of Syms should determine how SYL's income should be taxed. Since SYL was found to be a phantom, it was clearly appropriate to look to the true underlying source of its income. SYL's booked income was in reality generated from Syms' sales, property and payroll.

"It was Syms' use of the marks, its goodwill and its efforts in Maryland and elsewhere which gave the marks value and generated the income 'booked' in SYL."

SYL appealed the assessments to the Maryland Tax Court, with its "Petition of Appeal" headed "SYL, INC. c/o Syms Corporation[,] Syms Way[,] Secaucus, New Jersey 07094 v.

Comptroller of the Treasury." SYL's petition alleged, *inter alia,* that it was a Delaware corporation "organized in 1986 by its parent, Syms Corp. . . . to hold certain registered trademarks and trade names," that SYL had "as a valid business purpose the protection, maintenance and management of valuable intangible assets," that SYL maintains an office in Delaware, a separate bank account, and has its own corporate officers and board of directors who meet regularly, that SYL "is a bona fide corporation with substantial corporate substance" and with "a valid business purpose," that the taxation of SYL's income is not authorized by Maryland Code (1988, 1997 Repl.Vol., 2002 Supp.), § 10–402 of the Tax–General Article, or by any other Maryland statute, and that the Comptroller's assessments violate the Fourteenth Amendment's Due Process Clause and the Commerce Clause of the United States Constitution. The Comptroller's answer denied SYL's allegations concerning its viability, valid business purpose, substance, etc., as well as SYL's legal conclusions under the Maryland statutes and the federal Constitution.

The parties thereafter entered into a stipulation setting forth the procedural history of the case, the basic facts concerning Syms's operations in Maryland, the fact that SYL is a wholly-owned subsidiary of Syms, and SYL's lack of property, employees, or bank accounts in Maryland. The stipulation also agreed upon the introduction into evidence of twenty-eight exhibits which were attached. In addition to the numerous exhibits which were introduced, the Tax Court held a hearing extending over two days during which several witnesses testified. The administrative record discloses the following information about the creation and operation of SYL.

The suggestion to create SYL for tax benefit reasons originated from Coventry Financial, a consulting firm which approached Syms Corp. in June of 1986. Upon the creation of SYL as a trademark holding company, and SYI, Inc., as a second wholly-owned subsidiary which would act as an investment advisor to SYL, Syms Corp. was to assign the trademarks to SYL and SYL was to license the trademarks back to Syms. Then, Syms was to pay SYL a royalty for the use of the

trademarks, which SYL was to keep temporarily before the funds were sent back to Syms as a dividend payment. In the interim, SYL was to invest the funds, with SYI controlling the investment decisions. Coventry Financial's fee was directly tied to the total amount of tax savings generated from the implementation of its so-called "program."

One of Syms's inter-company documents stated that, once SYL received the royalty payments, SYL was to hold the payments in Delaware for "at least a couple of weeks." The document went on to explain that the payments would later be sent back to Syms in the form of a dividend in the same quarter to "avoid any variances on the financial statements which may alert a state auditor to this transaction." Furthermore, a memorandum outlining the Syms–SYL transaction, written by Richard Diamond, Syms's Secretary–Treasurer, to Syms's Chief Executive Officer, Sy Syms, stated that, while the royalty payment funds were being held temporarily in Delaware, it was "necessary" for SYI to be the investment advisor. The memorandum further stated that "it is necessary that it do[es]n't appear that the investment decisions are being made by Syms Corp." Notwithstanding this statement, three of the four officers of SYI were officers of Syms. On cross-examination, Mr. Diamond acknowledged that this "was one of Coventry's ideas to sort of distance SYL from Syms Corp. in terms of investing the money; to help in terms of the tax aspects of this transaction." He further acknowledged:

"Q. So would you agree that it was an idea that was designed to keep tax auditors from realizing what was going on?

"A. From—yes. From the tax part of it, yes."

Mr. Diamond later reiterated that, "just from a tax point of view ... I felt it was advantageous to create some distance between Syms Corp. and SYL."

SYL used the services of Gunnip & Company to establish a presence in Delaware. Among other things, Gunnip offered SYL a "Delaware address" and "mail forwarding." Additionally, a letter from Gunnip to Mr. Diamond advises that the

total $2400 per year fee paid to Gunnip "could be billed to [SYL] as rent monthly $100.00 and . . . as salary quarterly $300.00." Actually, SYL's Delaware "office" lacked a phone listing, had no office sign, and no business cards. SYL's Board of Directors consisted of four people: (1) Sy Syms who, as previously mentioned, was Syms's Chief Executive Officer; (2) Marcy Syms who was Syms's Chief Operating Officer; (3) Richard Diamond who was Syms's Secretary–Treasurer and Chief Financial Officer; and (4) Edward Jones who was an accountant with Gunnip. Jones also was SYL's only "employee," and, out of the $2400.00 annual fee paid to Gunnip, $1200 annually was designated as Jones's "salary."

Mr. Diamond testified that SYL hired outside trademark counsel to handle the protection of the trademarks. Nonetheless, on SYL's financial statements, no legal expenses were listed on any of the unaudited profit and loss statements submitted. Mr. Diamond explained that they "were probably paid for by Syms Corp." and that "[i]t didn't make a difference overall." In fact, nothing substantial appears to have changed with respect to the management and administration of the trademarks after the formation of SYL. During the cross-examination of Karen Ash, Syms's and SYL's outside trademark counsel, the following ensued:

"Q. Was there any difference whatsoever in the work performed by your law firm prior to and subsequent to the assignment of these marks from Syms to SYL?

"A. No.

"Q. You continued to do the same thing?

"A. Yes.

"Q. If a mark needed to be registered you took to registering it? If an infringement was suspected, your firm would take the appropriate action, correct?

"A. Correct."

Although the business purpose alleged for the formation of SYL was the "maintenance and management of valuable intangible assets," the license agreement between Syms and SYL

authorized Syms to take charge of such maintenance and management. It stated: "Licensor [SYL] shall have the right (but not the obligation) to take charge of the defense of any [infringement] claim, action or proceeding. . . . If licensor declines . . . to defend any such claim, action or proceeding, licensee may do so." The license agreement did impose some affirmative duties upon SYL, as licensor, in the area of quality control of the trademarks. Nevertheless, there is no indication in the record that Edward Jones, SYL's sole "employee," performed any of these duties. Nor are the quality control duties mentioned in the letter memorializing the services that Mr. Jones was to provide to Syms or SYL. Instead, according to the testimony, these duties were assumed by Syms's officers when they were wearing their SYL "hats." Additionally, the license agreement imposed upon Syms the duty to "deliver to Licensor a statement certified by the financial officer of Licensee showing a computation of Net Sales and the amount of royalty payable hereunder." The record discloses that no certified financial statements were ever provided to SYL.

SYL's cash receipts and disbursement journals fail to reveal any evidence of the economic substance of that corporation. In the relevant time period, SYL paid no costs associated with the protection of the trademarks, i.e., no costs to register the trademarks, no legal fees associated with the trademarks, and no telephone expenses associated with any discussion of the trademarks, since SYL apparently did not have a telephone. A study of SYL's financial statements reveals that, in some years, the royalties owed were never received. Finally, although "facilitating the franchising of the Syms trade name to third parties" was one of the primary reasons for the formation of SYL, the trademarks were never licensed to anyone but Syms Corp.

The Maryland Tax Court, which is an administrative agency,[2] in April 1999 issued an order reversing the assessments levied by the Comptroller. In an accompanying opinion, the

---

2. *See Shell Oil Co. v. Supervisor*, 276 Md. 36, 38, 343 A.2d 521, 522–523 (1975).

Tax Court incorporated by reference and quoted extensively from its opinion in another case, *MCIIT v. Comptroller*, Tax Court No. C–96–0028–01 (1999), stating that the analysis and applicable law in the two cases were the same.[3] The Tax Court pointed out that the parent corporation and the subsidiary were operating as a "unitary" business, that the Comptroller, relying upon *Comptroller v. Atlantic Supply Co.*, 294 Md. 213, 448 A.2d 955 (1982), and *Comptroller v. Armco*, 82 Md.App. 429, 572 A.2d 562, *cert. denied*, 320 Md. 634, 579 A.2d 280 (1990), *cert. denied*, 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991), asserted that the subsidiary lacked "substantial economic substance," and that, therefore, the subsidiary had a "sufficient nexus" with Maryland through the operations of the parent in Maryland so that Maryland could constitutionally tax an appropriate portion of the subsidiary's income. The Tax Court then stated that the *Atlantic Supply* and *Armco* holdings applied only when the subsidiary had no economic substance whatsoever, and that "we conclude that Petitioner [SYL] is an entity of substance and not a 'phantom.'" The Tax Court continued:

"In the instant case, the evidence clearly indicates that Petitioner is not just a book entry corporation. Petitioner maintains an office in Delaware. That office contains office furniture and corporate and financial records are kept there. Mail is received at the Delaware office location. It has its own bank account and has an employee. Legal counsel was retained by Petitioner for purposes of protection its 'marks'. The requisites for corporate existence were met; i.e., the drafting of by-laws, the election of a board of directors and corporate officers, the holding of regular and annual meetings, the recording of corporate minutes, and the ratification of dividends.

"Respondent claims that Petitioner 'was little more than a corporate vehicle designed to reduce state income taxes',

---

**3.** A judicial review action in the *MCIIT* case, presently pending before this Court, has been stayed under the automatic stay provisions of federal bankruptcy law. *See* 11 U.S.C. § 362(a).

(Respondent's Memorandum, p. 40), and points to the minimal expenses, the one employee, the mere formality of the corporate existence of Petitioner, and the timing of interentity transactions as support that petitioner was creating the 'illusion of substance', (Respondent's Memorandum, p. 31). In short, Respondent assessed on the basis that the Petitioner was a sham entity for the sole purpose to avoid Maryland taxes.

"Even if that were true, *Armco* and *Atlantic Supply* only apply to entities with no substance whatsoever. In addition, it is well settled that tax avoidance (rather than tax evasion) is a legitimate business purpose. If Petitioner was legally created with a tax avoidance purpose, absent authority and in a separate return environment, the Respondent cannot tax it. However, the evidence presented leads to the conclusion that Petitioner was established for non-tax reasons, among them:

● To hold and manage intangible assets in a separate corporation;

● To protect the transferred intangibles from the claims of Syms' creditors and from liabilities of Syms;

● To incorporate in a favorable corporate jurisdiction;

● To avert hostile take-overs; and

● To protect and enhance the value of Syms' name and its borrowing and business acquisition ability.

These facts easily distinguish the Petitioner from the phantom taxpayers in *Armco* and *Atlantic Supply*. Nexus cannot be attributed to it for Maryland taxation purposes."

Later the Tax Court concluded:

"Focusing solely on Petitioner, we find that its lack of instate activity precludes the imposition of the tax. Petitioner is not doing business in Maryland. Its income producing activity all occurs outside of Maryland. Petitioner has no offices, employees, agents or property in Maryland. Its only Maryland contact is an affiliation with an entity with a

Maryland presence. This affiliation is hardly enough to satisfy substantial nexus.

"Respondent relies on *Armco* and *Atlantic Supply* as support for the application of nexus due to the presence of Syms in Maryland. That reliance has been shown above to be erroneous. Respondent then points to the decision of *Geoffrey, Inc. v. South Carolina Tax Commission*, 313 S.C. 15, 437 S.E.2d 13 (1993) as precedent in the taxing of a Delaware holding company licensing trademarks and trade names to its parent in-state company. The *Geoffrey* Court concluded that the use of intangible property (the 'marks') by the in-state affiliate was sufficient to pass the constitutional nexus requirements in order to tax the out-of-state entity. * * * [A]s indicated above, we differ in our conclusions as to whether the substantial nexus requirement of the Commerce Clause was met. *Geoffrey* focused on the use of the marks by the in-state affiliate of the unitary group in order to determine the nexus of the foreign corporation. We disagree that that activity constitutes 'substantial' nexus.

"In addition, the unitary relationship between entities does not automatically establish nexus on all of the corporate entities in the unitary group."

The Tax Court also addressed an alternative argument by SYL, although pointing out that the court's constitutional holding rendered the issue moot. The court agreed with SYL that, under *CBS v. Comptroller*, 319 Md. 687, 575 A.2d 324 (1990), the Comptroller should have promulgated a regulation before attempting to tax a portion of the income of subsidiaries like SYL.

The Comptroller filed in the Circuit Court for Baltimore City an action for judicial review of the Tax Court's decision, and the Circuit Court affirmed the decision. The Comptroller took an appeal to the Court of Special Appeals. Before argument in the intermediate appellate court, this Court issued a writ of certiorari. *Comptroller v. SYL*, 360 Md. 485, 759 A.2d 230 (2000).

B.   No. 80, *Crown Cork & Seal Company (Delaware),*
*Inc. v. Comptroller of the Treasury*

Crown Cork & Seal (Delaware) (hereafter referred to as "Crown Delaware"), is a Delaware corporation and a wholly owned subsidiary of Crown Cork & Seal Company, Inc., (hereafter referred to as "Crown Parent"), also a Delaware corporation.   Crown Delaware is the owner of certain intellectual property assets, namely thirteen domestic patents and sixteen trademarks.   Crown Delaware's purported function is to manage and control these patents and trademarks.   As set forth in a stipulation of facts filed in the Maryland Tax Court, Crown Parent is a corporation "engaged in the manufacturing and sale of metal cans, crowns, and closures for bottles, can-filling machines, and plastic bottles and containers, worldwide, including in the State of Maryland."

For the tax years 1989 through 1993, Crown Delaware did not file corporate income tax returns in Maryland.   Crown Delaware did not directly own or lease tangible property in Maryland, had no employees in Maryland, and maintained no bank accounts in Maryland.   It did not sell or lease goods or services in Maryland, did not advertise in Maryland, and engaged in no mailings or solicitations to persons or entities in Maryland.   As both parties agreed in the stipulation filed with the Tax Court, Crown Parent did engage in extensive business in Maryland during this time period, as it operated manufacturing plants in Baltimore City, Harford County and Wicomico County, and marketed its products in Maryland.   Crown Parent timely filed Maryland corporate tax returns for this period.

In 1996, the Comptroller of Maryland issued a Notice of Assessment to Crown Delaware, stating that Crown Delaware owed for the years 1989 through 1993 Maryland corporate income taxes, including interest and penalties, in the amount of $1,421,034.   Crown Delaware timely protested the Comptroller's Notice of Assessment.   On February 25, 1997, the Comptroller issued a Notice of Final Determination that sustained the Notice of Assessment.   The Notice of Final Deter-

mination was similar to the previously quoted notice in the SYL case. To summarize, the Comptroller upheld the assessment on the grounds that Crown Delaware was a "phantom company," a mere corporate shell with little economic substance and no independent source of income. According to the Comptroller, Crown Delaware was an alter ego of Crown Parent, designed to help Crown Parent avoid Maryland corporate income taxes. The Comptroller asserted that Crown Parent's royalty payments to Crown Delaware on intellectual property rights were a means of shifting income out of Maryland and into Crown Delaware's home State of Delaware. The Comptroller stated that, by piercing the corporate veil of this "bookkeeping entity," and taxing Crown Delaware based on the apportionment factor of Crown Parent, the State of Maryland would recover the income taxes to which it was entitled.

Crown Delaware took an appeal to the Maryland Tax Court, challenging the Comptroller's assessment. As in the *SYL* case, Crown Delaware argued that the Comptroller was prohibited under the Commerce Clause of the United States Constitution, Art. 1, Section 8, cl. 3, from taxing it because Crown Delaware lacked a substantial nexus with the State of Maryland. Relying on the principle set forth in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977), that under the Commerce Clause a state tax is permitted when, *inter alia,* "the tax is applied to an activity with a substantial nexus with the taxing State," Crown Delaware asserted that there was no nexus in this case because it had no tangible property or business presence within Maryland. Crown Delaware also contended that the Comptroller erred in treating it as a "phantom corporation," asserting that it had employees, office space, and other corporate attributes that imbued it with sufficient economic substance, and that it was formed for the valid business purpose of protecting its parent's intellectual property assets. Finally, like the subsidiary in the *SYL* case, Crown Delaware contended that the Comptroller's attempt to tax it represented

a change in policy which should have been accomplished by the promulgation of a regulation.

The Comptroller's arguments were essentially the same as in the *SYL* case. The Comptroller contended that there was a nexus between Crown Delaware and the State of Maryland, based on Crown Delaware's licensing of intangible property rights to its parent for use in products that were sold in Maryland. The Comptroller argued that Crown Delaware relied upon its unitary parent for its entire source of income, as Crown Parent's marketing to consumers of products based on Crown Delaware's licensed patents and trademarks was Crown Delaware's exclusive source of royalty fees. In addition, the Comptroller analogized Crown Delaware to the "sham" subsidiaries involved in *Armco* and in *Comptroller v. Atlantic Supply Co.* The Comptroller pointed out that Crown Delaware lacked a separate office and employees from Crown Parent, did not exert a direct involvement in the control of the intellectual property assets which it was assigned, and did not conduct business activities on its own but, instead, relied on the business activities of Crown Parent. The Comptroller also asserted that the assessments did not represent a change in policy so as to require promulgation by a regulation.

The evidence before the Tax Court disclosed the following. Crown Delaware was incorporated in 1989, and Crown Parent assigned its intellectual property assets to Crown Delaware in exchange for all of Crown Delaware's issued stock. Crown Delaware then granted to Crown Parent an exclusive license, to continue from year to year unless terminated by either party, to manufacture, use and sell the products covered by these assets. In consideration for Crown Delaware's licensing of these intellectual property rights, Crown Parent agreed to pay Crown Delaware a royalty based on Crown Parent's sales.

In attempting to create a Delaware presence, Crown Delaware employed a third party, Organization Services, Inc. ("OSI"), "to facilitate the establishment of its business operations." OSI's brochure stated that it provided "complete services for corporations to minimize state taxes" through the

use of various suggested subsidiaries. George P. Warren, the founder and president of OSI, described his company's function as "providing nexus services to Delaware Investment Holding Companies." Among these "nexus services," the OSI brochure listed "discretionary mail forwarding." Additionally, the OSI brochure warned prospective customers as follows:

"*Caution!*

"A Delaware subsidiary must have substance to satisfy other states as to its situs within Delaware. This will include, but is not limited to, the following evidence of Delaware activity:

Employees

Personal income tax withholding

Unemployment tax reporting

Bank accounts and other assets

Office space

Furniture and equipment

Stationery and business cards

Books and records

Director and stockholder meetings"

OSI provided these "nexus services" for about 400 other companies like Crown Delaware. Mr. Warren's duties as an "employee" of Crown Delaware were described by Crown Parent's general counsel as "do[ing] everything necessary basically in Delaware to comply with the law and regulations to give substance to this company as a viable and good company in Delaware."

Crown Delaware leased its corporate office space from OSI at the rate of up to $100.00 per month. In return, OSI provided "desk space" on a "part-time or full-time basis" as well as conference rooms for meetings. Under the sublease agreement between OSI and Crown Delaware, OSI was to list Crown Delaware's name on one of the telephone numbers assigned to OSI in the Wilmington, Delaware "white pages" directory. OSI's address is listed on Crown Delaware's company checks.

Additionally, Crown Delaware hired OSI employees to manage its daily operations. Each of the nine part-time employees from OSI had a written employment agreement with Crown Delaware and was paid directly by Crown Delaware, which also withheld and remitted withholdings to the appropriate taxing authorities. A review of the employees' W–2 forms, however, reveals that the wages paid to these employees were insignificant in comparison with the ordinary labor costs incurred by a corporation earning revenue of over thirty million dollars per year. For example, in 1989, the total annual wages paid for the nine employees were $148.00; in 1990, $668 was the total amount paid in employee wages for the nine employees; in 1991, $562.64; for 1992, $623.79; and, finally, in 1993, the total amount of wages paid for all nine employees of Crown Delaware was $843.66. These employees were paid only once annually. These nine employees were clerical employees whose responsibilities never involved any intellectual property expertise.

George P. Warren, Jr., the president of OSI, is both an officer and director of Crown Delaware. Under the terms of his employment contract, Mr. Warren's salary for these services is $200 per year. Jane Warren, the Vice–President and Secretary of OSI, is also an employee of Crown Delaware, as is Lee Lieberman, assistant secretary and assistant treasurer of OSI. OSI also serves as Crown Delaware's registered agent for service of process in the State of Delaware. The employment agreements define the "place of employment" as "any suitable location within the greater Wilmington metropolitan area."

Crown Delaware's balance sheets for the years in question reveal that, although the parent company made royalty payments to Crown Delaware, Crown Delaware immediately loaned the total payments back to its parent company. With regard to four of the five royalty payments in the relevant time period, the wire transfer records show that the royalty payments paid by Crown Parent were wired back to Crown Parent *on the same day,* creating an immediate circular flow. From 1989 to 1993, the debt owed by the parent company to

Crown Delaware increased each year by the same amount as the royalty that the parent owed to Crown Delaware. As of 1993, there was no evidence in the record of the debt being paid. Nor does any loan agreement, stipulating to the terms of repayment or the sanctions in the event of default, appear in the record. Also notable was the fact that Crown Parent's 1991 royalty payment to Crown Delaware was paid on November 7, 1991, which was thirty-one days before Crown Delaware billed Crown Parent for the royalty payment and fifty-four days before the end of the year.

Moreover, for the years 1990 through 1993, despite having revenues that averaged around thirty-seven million dollars annually, Crown Delaware's actual operating costs averaged just over two thousand dollars per year. The regular operating costs that inevitably arise in a normal business operation, such as meals and entertainment, telephone, and postage, were virtually non-existent on Crown Delaware's balance sheets. Over the five-year period in question, Crown Delaware incurred a total of twenty dollars in meals and entertainment, about sixty dollars in telephone charges, and about one hundred dollars in postage. Travel costs for the entire period in question amounted to less than seven dollars. Additionally, Crown Delaware's financial statements reported no depreciation for personal property.

Despite the fact that Crown Delaware's sole raison d'être was to manage its parent company's intellectual property, the subsidiary managed to avoid any and all legal fees associated with the patents and trademarks at issue. Following the creation of Crown Delaware, Crown Parent continued to use the services of the same two patent law firms that handled its intellectual property prior to Crown Delaware's creation.

Additionally, the patent and trademark license agreements disclose that Crown Delaware, the repository of this intellectual property, granted an *exclusive* license to its parent company. Accordingly, Crown Delaware could not license these intangibles to any other entity. Crown Parent, however, was entitled to do so, since the agreements authorized it to sub-

license the intangibles to any third party. Furthermore, the licensing agreements imposed upon Crown Parent the responsibility of maintaining and defending the validity and ownership of these intangibles, as well as the general administrative duties of complying with all laws and regulations that may relate to them.

The administrative record repeatedly shows instances where the formalities that normally serve to separate a parent corporation from its subsidiary were blurred. For example, there are instances where the terms "Crown Cork & Seal Company, Inc." and "Crown Cork & Seal Company (Delaware), Inc." are used interchangeably. There are also examples of Crown Parent's officers or directors signing documents as Crown Delaware's officers when in fact they are not officers; examples of Mr. Warren signing as Secretary of Crown Delaware when in fact he was not Secretary; or examples of the address of one entity being listed as the address of the other entity. In each instance, Crown Parent's general counsel explained that these examples were merely "screw-ups" or "mistakes."

As in the *SYL* case, the Tax Court issued an order reversing the assessments. In a brief opinion accompanying the order, the Tax Court "incorporated by reference" its opinion in *SYL*. While the Tax Court recognized that Crown Delaware and its parent were a unitary business, it rejected the attempt of the Comptroller to apply the holdings of *Atlantic Supply* and *Armco* to the taxation of Crown Delaware. The court expressed the view that the holdings of these two cases were limited to the taxation of "phantom" or "sham" subsidiaries with "no genuine economic substance." The administrative agency concluded that Crown Delaware had "economic substance," and held as follows:

"Thus the factual resolution for the Court is whether nexus exists between Petitioner and Maryland. In order to meet Commerce Clause nexus requirements, there must be a 'substantial nexus' with the taxing state. *Complete Auto Transit v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Petitioner does not own or lease property in

Maryland. Petitioner has no employees, agents or offices in Maryland. Its income producing activity all occurs outside of Maryland. Crown Parent is the only contact Petitioner has with Maryland and that contact is not sufficient to meet the substantial [nexus] requirement.

"Nexus attributed to an out-of-state entity was found to be proper by the Maryland Courts only when the entities were true phantom corporations.... The evidence presented clearly shows that Petitioner is not a phantom or sham corporation. Petitioner is a viable entity established for valid business purposes, including the protection of valuable intellectual property rights from hostile takeovers of the parent corporation. Petitioner maintained an office in Delaware, met all corporate formalities, had separate bank accounts and employees performing services pursuant to written employment agreements."

The Comptroller filed in the Circuit Court for Baltimore City this action for judicial review of the Tax Court's decision, and the Circuit Court affirmed. The Comptroller filed an appeal to the Court of Special Appeals. Again, before argument in the intermediate appellate court, this Court issued a writ of certiorari. *Comptroller v. Crown Cork & Seal Company (Delaware), Inc.*, 360 Md. 488, 759 A.2d 232 (2000).

## II.

The controlling principles of Maryland income tax law and federal constitutional law, in cases like the instant ones, were recently summarized by Judge Rodowsky for this Court in *Hercules, Inc. v. Comptroller,* 351 Md. 101, 716 A.2d 276 (1998). First, with regard to federal constitutional limitations, the *Hercules* opinion stated (351 Md. at 109–111, 716 A.2d at 279–280, some internal quotation marks omitted):

"Under both the Due Process and the Commerce Clauses of the Constitution, a State may not, when imposing an income-based tax, 'tax value earned outside its borders.' *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552 (1983)

(quoting *ASARCO Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982)).

\*    \*    \*

"In order to levy a tax upon Hercules's capital gain from the sale of . . . stock, there must be some nexus linking this income to activities within the state. The necessary nexus usually 'is satisfied by demonstrating the existence of unitary business, part of which is carried on in the taxing state.' *NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 132, 544 A.2d 764, 771 (1988). Where the nexus exists, the Maryland tax on a corporation engaged in a multistate business is governed by Maryland Code (1957, 1997 Repl. Vol.), § 10–402(c) of the Tax–General Article (TG), which requires that net income be apportioned to this state on the basis of a formula using property, payroll, and sales. *See Random House, Inc. v. Comptroller of the Treasury,* 310 Md. 696, 697, 701, 531 A.2d 683, 683, 685 (1987); *see also NCR Corp.,* 313 Md. 118, 141–42, 544 A.2d 764, 775; *Xerox Corp. v. Comptroller of the Treasury, Income Tax Div.,* 290 Md. 126, 129–30, 428 A.2d 1208, 1211 (1981); *accord Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980).

\*    \*    \*

"The Supreme Court has recently reemphasized its three-part test in determining whether a subsidiary is a part of the unitary business of the parent; those three elements are: (1) functional integration, (2) centralization of management, and (3) economies of scale. *Allied–Signal, Inc. v. Director, Div. of Taxation,* 504 U.S. 768, 783, 112 S.Ct. 2251, 2260, 119 L.Ed.2d 533, 549 (1992)."

Turning to the scope of § 10–402 of the Maryland Tax–General Article, the Court in *Hercules* reiterated (351 Md. at 110, 716 A.2d at 280, some internal quotation marks omitted):

"The legislative purpose underlying this statute is to tax multi-state corporations doing business in Maryland to the bounds permitted by the United States Constitution. *NCR*

*Corp.,* 313 Md. at 146, 544 A.2d at 777. To that end, the question before us becomes one of federal constitutional, rather than of Maryland statutory, law. In resolving that question, the burden is on the taxpayer to show 'by clear and cogent evidence' that [the state tax] results in extraterritorial values being taxed. *Container Corp.,* 463 U.S. at 175, 103 S.Ct. at 2945, 77 L.Ed.2d at 559–60."

In *NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 131–132, 544 A.2d 764, 770–771 (1988), Judge Adkins for the Court explained:

"Apportionment under the unitary business formula, however, is not without its restrictions. The due process and commerce clauses do not allow states to tax a corporation's interstate activities unless there exists a ' "minimal connection" or "nexus" between the interstate activities and the taxing State, and "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." ' " *Exxon Corp. v. Wisconsin Dept. of Revenue,* 447 U.S. 207, 219–220, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66, 79 (1980) (quoting *Mobil Oil Corp. v. Comm'r of Taxes, supra,* 445 U.S. at 436–437, 100 S.Ct. at 1231, 63 L.Ed.2d at 520).

\*   \*   \*

"[The nexus p]rong ... of the test is satisfied by demonstrating the existence of unitary business, part of which is carried on in the taxing state. Hellerstein, 'State Income Taxation of Multijurisdictional Corporations, Part II: Reflections on *ASARCO* and *Woolworth,*' 81 Mich.L.Rev. 157, 168 (1982) (hereinafter 'State Income Taxation'). Once the requisite nexus has been shown, the taxpayer then bears the burden of demonstrating that the income it seeks to exclude from taxation was derived from unrelated business activity that constituted a discrete business enterprise. *See Container Corp. supra,* 463 U.S. at 164, 103 S.Ct. at 2939–2940, 77 L.Ed.2d at 552; *Exxon Corp., supra,* 447 U.S. at 223–224, 100 S.Ct. at 2120, 65 L.Ed.2d at 81; *Mobil Oil, supra,* 445 U.S. at 442, 100 S.Ct. at 1234, 63 L.Ed.2d at 524."

The *NCR* opinion, 313 Md. at 146, 544 A.2d at 777, went on to emphasize "that the goal of [the applicable Maryland statute] is 'taxation of so much of a corporation's net income as is constitutionally permissible,'" quoting *Xerox Corp. v. Comptroller*, 290 Md. 126, 142, 428 A.2d 1208, 1217 (1981).[4]

A case relied upon by the Comptroller, and distinguished by the Tax Court, SYL, and Crown Delaware, is *Comptroller v. Atlantic Supply Co., supra*, 294 Md. 213, 448 A.2d 955. In that case, Atlantic Supply Co. was a wholly owned subsidiary of the Macke Company, a vending machine company, with headquarters in Maryland and with wholly owned subsidiary vending machine companies in other states. Atlantic Supply was created as a wholesaler to purchase Coca–Cola products for the parent and various subsidiary vending machine companies because Coca–Cola refused to sell directly to retailers. Atlantic Supply had no separate place of business, no "office that [was] exclusively its own," no employees or payroll, and no bank account, although it had a post office box. 294 Md. at 217, 448 A.2d at 958. This Court held that the parent corporation and Atlantic Supply carried on a unitary business, and that (294 Md. at 223–224, 448 A.2d at 961)

"Atlantic's trade or business operates exclusively within Macke's unitary business. Even though Atlantic must file a separate tax return, the particular nature of its business cannot be ignored. Atlantic's business could not function without the funds supplied by Macke-parent and without the Macke-branches as captive customers. Within the frame-

---

4. House Bill 753 of the 2003 session of the General Assembly which passed both houses of the General Assembly but was vetoed by the Governor on May 21, 2003, concerned several provisions of the Maryland Code relating to taxation. A portion of the bill would have added language to § 10–402 of the Tax–General Article, apparently with the purpose of underscoring the scope of the section. The Governor's veto message stated in pertinent part:

"The changes to corporate income taxation include restrictions on Delaware Holding Company transactions.... Currently, the Comptroller is involved in litigation regarding this very issue. At this juncture, I believe it is prudent to wait until the Judiciary rules on the matter."

work of the kind of business it does, Atlantic enjoys the services of Macke-parent employees for Atlantic's clerical and accounting functions and the services of Macke-branch employees as Atlantic's buying and selling agents. Those employees worked in Macke's unitary business.... Those individuals in the general employ of Macke-parent and of the Macke-branches, who conducted the business of Atlantic, were sufficiently related with Atlantic, through Macke's unitary business, to permit Atlantic to apportion its income."

This Court held that the portion of Atlantic Supply's income that was attributable to Maryland was subject to Maryland income tax. Nevertheless, no argument had been made in the *Atlantic Supply* case that all of that subsidiary's income should be exempt from Maryland income taxes.

More pertinent is the opinion of the Court of Special Appeals in *Comptroller v. Armco, supra,* 82 Md.App. 429, 572 A.2d 562. That case involved three separate manufacturers doing business in Maryland (Armco, Inc., General Motors, and Thiokol), each of which created a wholly owned sales subsidiary known as a Domestic International Sales Corporation or DISC. The creation of such a subsidiary, as a device to encourage exports, had tax advantages under the federal Internal Revenue Code. Judge Getty for the Court of Special Appeals in *Armco* explained the federal tax advantages as follows (82 Md.App. at 430–431, 572 A.2d at 563–564):

"By definition, a sales DISC (I.R.C., § 992(a)(1)(A)), earns income because it buys goods from its parent company and then resells the goods to an actual overseas customer; a commission DISC earns its income by a contractual agreement with its parent company giving it a percentage of each qualifying export sale made by the parent (I.R.C., § 992(a)(1)(C)). In either case, no activity is performed by the DISC to earn the income.

"DISC income is taxable income, but if the DISC transactions meet the tests of I.R.C., §§ 991–997, a DISC pays no federal taxes. Instead, a percentage of its income is imputed to the parent company as a constructive taxable dividend; the balance is taxable to the parent when it is actually

distributed as a dividend. In short, DISCs are an approved device designed to defer paying the full amount of tax due when the income is received. This artificial accounting between related corporations is an exception to the general rule, I.R.C. § 482, requiring transactions between parent and subsidiary corporations to be arms length dealing."

In the *Armco* case, the Comptroller had attempted to subject a portion of each DISC's income to Maryland income tax, but the Tax Court and the Circuit Court, as in the present cases, held that there was an insufficient nexus with Maryland so as to allow Maryland taxation under the Commerce Clause of the United States Constitution. As pointed out by the Court of Special Appeals (82 Md.App. at 435, 572 A.2d at 566), the DISCs

"herein persuaded the Tax Court that nexus to tax DISCs must come from Maryland property, payroll, or sales by the DISC itself. We think that reasoning is flawed due to the very nature of a DISC, which has no tangible property or employees and can only conduct its activity and do business through branches of its unitary affiliated parent."

In language that is equally applicable to the *SYL* and *Crown Delaware* cases, the Court of Special Appeals in *Armco* concluded (82 Md.App. at 436, 572 A.2d at 566):

"The three key elements necessary for constitutional nexus were affirmatively established in each of these three DISC cases. They are:

1. The parent is engaged in business in Maryland.

2. The parent is unitary with the DISC.

3. The apportionment formula is fair.

"Activity directly connected to the DISCs took place in Maryland in that the goods produced here and sold overseas generated the DISC income. That activity included assembly of vehicles by GM, production of rocket motors by Thiokol, and steel fabrication by Armco."

The Court of Special Appeals in *Armco* held that a portion of each subsidiary's income, namely that properly attributable to activity in Maryland, was subject to Maryland income tax.

SYL and Crown Delaware, like the Tax Court and the Circuit Court, take the position that the holding of the *Armco* case applies only where the subsidiary lacks all substance or is a "phantom" corporation. SYL and Crown Delaware point to the Tax Court's conclusions that each of them has economic substance. Treating these conclusions as findings of fact, SYL and Crown Delaware argue that the findings are supported by substantial evidence and that, therefore, they are binding upon this Court in these judicial review actions.

▮▮ Preliminarily, the basic facts in these two cases are undisputed. Moreover, neither case involves the situation where some factors point to one conclusion, other factors point to a contrary conclusion, and, therefore, a reviewing court should accord a degree of deference to the balance struck by the administrative agency as trier of facts. *Cf. Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834–839, 490 A.2d 1296, 1300–1303 (1985); *Baltimore Lutheran High School v. Employment Security Administration,* 302 Md. 649, 663–664, 490 A.2d 701, 709 (1985); *Comptroller v. Haskin,* 298 Md. 681, 692–694, 472 A.2d 70, 76–77 (1984). Under circumstances like those in the present cases, where the facts before the administrative agency were undisputed, the legal conclusion based on those facts has been treated as an issue of law. *See, e.g., Comptroller v. Gannett,* 356 Md. 699, 707, 741 A.2d 1130, 1134–1135 (1999); *Hercules v. Comptroller, supra,* 351 Md. at 110, 716 A.2d at 280; *State Department v. Consumer Programs,* 331 Md. 68, 72–76, 626 A.2d 360, 362–365 (1993); *Comptroller v. Atlantic Supply Co., supra,* 294 Md. at 218–221, 448 A.2d at 958–960.[5]

---

5. Even if the ultimate conclusions were viewed as findings of fact, we would hold that the Tax Court's findings, that SYL and Crown Delaware had real economic substance, were unsupported by substantial evidence in light of the entire records.

■ The records in these cases demonstrate that SYL and Crown Delaware had no real economic substance as separate business entities. They resembled the subsidiaries involved in the *Armco* case, except that SYL and Crown Delaware had a touch of "window dressing" designed to create an illusion of substance. Neither subsidiary had a full time employee, and the ostensible part time "employees" of each subsidiary were in reality officers or employees of independent "nexus-service" companies. The annual wages paid to these "employees" by the subsidiaries were minuscule. The so-called offices in Delaware were little more than mail drops. The subsidiary corporations did virtually nothing; whatever was done was performed by officers, employees, or counsel of the parent corporations. The testimony indicated that, with respect to the operations of the parents and the protections of the trademarks, nothing changed after the creation of the subsidiaries. Although officers of the parent corporations may have stated that tax avoidance was not the sole reason for the creation of the subsidiaries, the record demonstrates that sheltering income from state taxation was the predominant reason for the creation of SYL and Crown Delaware. For a discussion of the nature of Delaware trademark-holding subsidiaries like SYL and Crown Delaware, *see* Glenn R. Simpson, *Diminishing Returns: A Tax Maneuver in Delaware Puts Squeeze on States*, THE WALL STREET JOURNAL, August 9, 2002, at p. A1. *See also*, Craig J. Langstraat and Emily S. Lemmon, *Economic Nexus: Legislative Presumption or Legitimate Proposition?* 14 Akron Tax J. 1 (1999).

In reality, SYL and Crown Delaware have no more substance than the subsidiary DISC corporations involved in the *Armco* case. Under the holding of *Armco*, with which we fully concur, an appropriate portion of SYL's and Crown Delaware's income was subject to Maryland income tax.

Other courts have also upheld the application of state income tax laws with respect to a portion of the income of out-of-state subsidiaries having the sole function of owning their parents' trademarks. In *Syms Corp. v. Commissioner of Revenue*, 436 Mass. 505, 506, 765 N.E.2d 758, 760 (2002), the

Supreme Judicial Court of Massachusetts upheld the Commissioner of Revenue's "disallowance of deductions Syms had taken for royalty payments it had made to its wholly owned subsidiary, SYL, Inc." The description of the relationship between Syms and SYL, by the Massachusetts Supreme Judicial Court, is a perfect fit in one of the cases at bar (436 Mass. at 509, 765 N.E.2d at 762, footnote omitted):

"SYL's corporate 'office' consisted of an address rented from Jones's Delaware accounting firm, for an annual fee of $1,200. The accounting firm provided this same service to 'a couple of hundred' other corporations that used Delaware subsidiary corporations to hold their intangible assets. Jones was not only a partner of the accounting firm, he was SYL's only employee, serving in a part-time capacity for which he was paid $1,200 per year.

"The business operations of Syms did not change after the transfer and license-back of the marks. All of the work necessary to maintain and protect the marks continued to be done by the same New York City trademark law firm that had previously performed those services, and Syms (not SYL) continued to pay all the expenses attendant thereto. All efforts to maintain the good will and thus to preserve the value of the marks were undertaken by Syms, and all advertising using the marks was controlled and paid for by Syms or by a wholly owned Syms subsidiary formed solely to do advertising. The choice of which products would be sold under the marks, as well as the quality control of those products, remained the responsibility of the same persons who had done that work before the transfer— Sy Syms, himself, and the Syms staff of buyers."

The Massachusetts court continued (436 Mass. at 509–510, 765 N.E.2d at 762–763):

"Syms does not contest the validity of the 'sham transaction doctrine' and the commissioner's authority under that doctrine to disregard, for taxing purposes, transactions that have no economic substance or business purpose other than tax avoidance. It is a doctrine long established in State and Federal tax jurisprudence dating back to the seminal case of

*Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)."

The court upheld the administrative finding "that the transfer and license back transaction had no practical economic effect on Syms other than the creation of tax benefits, and that tax avoidance was the clear motivating factor and its only business purpose." 436 Mass. at 511, 765 N.E.2d at 764.

The Supreme Court of South Carolina in *Geoffrey, Inc. v. South Carolina Tax Commission,* 313 S.C. 15, 19–20, 437 S.E.2d 13, 16 (1993), upheld the imposition of state income tax on a portion of the income of a Delaware trademark-holding subsidiary of Toys R Us which had stores in South Carolina, saying:

"In our view, Geoffrey has not been unwillingly brought into contact with South Carolina through the unilateral activity of an independent party. Geoffrey's business is the ownership, licensing, and management of trademarks, trade names, and franchises. By electing to license its trademarks and trade names for use by Toys R Us in many states, Geoffrey contemplated and purposefully sought the benefit of economic contact with those states. Geoffrey has been aware of, consented to, and benefitted from Toys R Us's use of Geoffrey's intangibles in South Carolina. Moreover, Geoffrey had the ability to control its contact with South Carolina by prohibiting the use of its intangibles here as it did with other states. We reject Geoffrey's claim that it has not purposefully directed its activities toward South Carolina's economic forum and hold that by licensing intangibles for use in South Carolina and receiving income in exchange for their use, Geoffrey has the 'minimum connection' with this State that is required by due process. *See American Dairy Queen Corp. v. Taxation and Revenue Dep't,* 93 N.M. 743, 605 P.2d 251 (1979); *AAMCO Transmissions, Inc. v. Taxation and Revenue Dep't,* 93 N.M. 389, 600 P.2d 841, *cert. denied,* 93 N.M. 205, 598 P.2d 1165 (1979).

"In addition to our finding that Geoffrey purposefully directed its activities toward South Carolina, we find that

the 'minimum connection' required by due process also is satisfied by the presence of Geoffrey's intangible property in this State."

The South Carolina Supreme Court concluded as follows (313 S.C. at 23–24, 437 S.E.2d at 18): "We hold that by licensing intangibles for use in this State and deriving income from their use here, Geoffrey has a 'substantial nexus' with South Carolina." [6]

We hold that a portion of SYL's and Crown Delaware's income, based upon their parent corporations' Maryland business, is subject to Maryland income tax.

## III.

■ A final issue decided by the Tax Court was whether, under *CBS v. Comptroller, supra,* 319 Md. 687, 575 A.2d 324, the Comptroller was required to promulgate an administrative regulation as a condition precedent to the imposition of Maryland income tax upon portions of SYL's and Crown Delaware's income. The Tax Court stated that the promulgation of a regulation was required, but we disagree.

The *CBS* case involved a policy matter that had been delegated to the Comptroller. The Comptroller had adopted one particular policy regarding the matter, and later the Comptroller changed to a different policy. We held that, under such circumstances, the Comptroller's change should have been embodied in a new administrative regulation. The instant cases do not involve a policy matter that has been

---

**6.** The issue has also arisen in New Mexico, and the Court of Appeals of New Mexico in *KMart Properties, Inc. v. Taxation and Revenue Department of the State of New Mexico,* N.M. Ct.App. Nov. 27, 2001, held that the income paid to the out-of-state trademark-holding subsidiary was subject to state income taxes. The New Mexico Supreme Court granted a petition for a writ of certiorari in the case, *KMart Properties v. Taxation and Revenue Department,* 131 N.M. 564, 40 P.3d 1008 (2002), but the case has been stayed pursuant to the automatic stay provisions of the bankruptcy law, 11 U.S.C. § 362(a).

The same issue is now pending in the North Carolina courts, where the Wake County Superior Court has upheld an administrative decision against a trademark-holding subsidiary.

delegated to the Comptroller. Instead, under our cases, the income involved is taxable under the Maryland statutory provisions to the extent permissible under the Commerce Clause and principles of due process. The issue is the sufficiency of a nexus between the income and the State of Maryland so as to permit the imposition of the tax under the United States Constitution.

In addition, even if it were pertinent, the case does not involve a *change* in the Comptroller's policy. Prior to the assessments in these cases, the Comptroller had no policy regarding the matter. The creation of wholly owned trademark-holding Delaware subsidiaries has been a fairly recent development.

There were other issues raised in these cases which the Tax Court did not reach. Consequently, we shall direct a remand to that administrative body.

*JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED, AND CASES REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE ORDERS OF THE MARYLAND TAX COURT AND TO REMAND THE CASES TO THE TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEES TO PAY COSTS.*