985 A.2d 593

The CLASSICS CHICAGO, INC., et al.

v.

COMPTROLLER OF the TREASURY.

No. 2047, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Jan. 4, 2010.

---

David Swetnam–Burland (Martin I. Eisentein, Daniel A. Nuzzi, Brann & Isaacson, on the brief), Lewiston, Maine, for appellant.

Brian L. Oliner (John K. Barry, Michael J. Salem, Douglas F. Gansler, Atty., Gen., on the brief), Annapolis, for appellee.

Panel: JAMES R. EYLER, WOODWARD, KEHOE, JJ.

JAMES R. EYLER, J.

The Classics Chicago, Inc. ("Classics") and The Talbots, Inc. ("Talbots"), appellants, appeal from a judgment entered by the Circuit Court for Baltimore City, affirming a Maryland Tax Court decision, which had affirmed income tax assessments against appellants by the Comptroller of the Treasury, appel-

lee. The assessments were for the years 1993–2003 ("the Taxable Period").

The principal issue before us is whether Classics, a wholly owned subsidiary of Talbots, and which has no physical presence in this State, can be constitutionally required to pay State income taxes on its income, when Talbots maintains a physical presence in this State. Resolution of that issue turns on whether there is a substantial nexus between Classics and this State so that imposition of income tax does not violate the Commerce Clause of the United States Constitution or principles of due process. For the most part, the parties' arguments address their differing interpretation of the nature and extent of the holding in *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399, *cert. denied,* 540 U.S. 984, 124 S.Ct. 478, 157 L.Ed.2d 375 and 540 U.S. 1090, 124 S.Ct. 961, 157 L.Ed.2d 795 (2003), in which the Court of Appeals concluded that the nonresident subsidiary involved in that case was subject to State income tax.

A secondary issue is whether the assessment against Talbots, arising out of the same underlying transactions relevant to the assessment against Classics, is unlawful. The assessment against Talbots was in the alternative and effective only if the assessment against Classics is not upheld on appeal.

We shall affirm the circuit court's judgment, upholding the assessment against Classics; thus, there is no need to address the assessment against Talbots.

## Background

The underlying facts are not in dispute. Classics, a Delaware corporation, is a wholly owned subsidiary of Talbots, a Delaware corporation. During the Taxable Period, Talbots sold specialty women's clothing by catalog and in retail stores located in numerous states, including Maryland. In 1973, Talbots, a private company at the time, was acquired by General Mills, Inc. ("General Mills"). In 1988, General Mills sold its interest in Talbots to Jusco (USA), Inc. ("Jusco USA"),

a wholly owned subsidiary of Jusco Company Ltd. ("Jusco"), a Japanese corporation.

At the time of the 1988 sale, Talbots sold its trademarks, tradenames, and related intellectual property ("Talbots trademarks") to Jusco (Europe) BV ("Jusco BV"), a Dutch subsidiary of Jusco, for $100,000,000. Jusco BV financed the purchase of the Talbots trademarks primarily through a loan from Jusco, its parent. Appellants presented evidence that the sale of Talbots trademarks to Jusco BV was not motivated by considerations of state income tax consequences; rather, it was motivated by the desire to obtain favorable accounting and tax treatment under Japanese and Dutch law and to facilitate the expected worldwide expansion by Jusco.

By agreement dated June 26, 1988, Jusco BV licensed to Talbots the right to use the Talbots trademarks for a royalty determined by a percentage of Talbots' net sales. During the time of this license agreement, Talbots deducted its royalty payments to Jusco BV on its federal income tax returns. The Internal Revenue Service audited Talbots' tax returns and did not disallow those deductions, in whole or in part.

In November, 1993, Jusco USA implemented an initial public offering ("IPO") of a minority interest in Talbots. On October 20, 1993, prior to and incident to the IPO, Classics was incorporated.

Throughout the Taxable Period, Classics rented office space from Talbots and maintained its principal place of business and domicile in Chicago, Illinois. Throughout the Taxable Period, Classics did not own or lease tangible property in this State and did not have any employees or bank accounts in this State.

Incident to the IPO, Classics purchased the Talbots trademarks from Jusco BV for 103 million dollars. Classics financed the purchase through a loan from Talbots, its parent, in the amount of 102 million dollars. By agreement dated November 26, 1993, Classics licensed to Talbots the right to use the Talbots trademarks for a royalty to be paid by Talbots determined by a percentage of Talbots' net sales. Appellants

presented evidence that the royalty rate was an arm's length rate under § 482 of the Internal Revenue Code, and appellee did not introduce any evidence to the contrary.

Classics maintained and preserved the Talbot trademarks. Classics paid rent to Talbots for its offices in Chicago. Classics paid an independent contractor to perform accounting and bookkeeping services. During the Taxable Period, Classics paid cash dividends to Talbots in amounts that were entered into evidence and were undisputed.

Appellants complied with formalities required by corporate law.

On March 14, 2005, appellee issued a Notice of Assessment to Classics, assessing income tax for the years 1989 through 2003 in the amount of $2,078,928, plus interest and penalties. On the same date, appellee issued a Notice of Assessment to Talbots, assessing income tax for the years 2001 and 2002 in the amount of $306,090, plus interest and penalties. Appellants protested the assessments. On April 24, 2006, appellee issued a Notice of Final Determination, eliminating the assessment against Classics for the years 1989 through 1992, and affirming the assessment for the Taxable Period, in the total amount of $2,102,100. On the same date, appellee issued a Notice of Final Determination, affirming the assessment against Talbots in the total amount of $515,602 but as an alternative to the assessment of Classics, effective only if the assessment against Classics is not upheld on appeal.

The basis of the assessments was that, during the Taxable Period, Talbots filed State income tax returns and deducted royalty payments to Classics, but Classics did not file State income tax returns and did not report the royalty payments as State taxable income. The assessment against Classics was pursuant to Maryland Code (2004 Repl.Vol.) § 10–402 of the Tax–General Article (TG), which provides that the portion of a nonresident corporation's income "derived from or reasonably attributable to its trade or business in this State" that is otherwise taxable must be allocated to this State for State

income tax purposes.[1] The assessment against Talbots was based on appellee's disallowance of its royalty payments to Classics for the years 2001 and 2002 as ordinary and necessary business expenses under § 162 of the Internal Revenue Code.[2]

Appellants timely appealed to the Tax Court. The Tax Court consolidated the two appeals and held hearings on September 19, 2007 and December 13, 2007. The parties filed a written stipulation which included the above information and an agreement that documents attached as exhibits were authentic. Edward Larsen, Senior Vice President and Chief Financial Officer of Talbots, and Maureen Grady, Talbots' Managing Director of Corporate Taxes, testified on behalf of appellants.

On April 11, 2008, the Tax Court issued a Memorandum of Grounds for Decision and an order. The court affirmed the assessments and interest but reduced the amount of the penalty. On April 28, 2008, the Tax Court modified its order and provided that the assessment against Talbots "will remain effective and enforceable only in the event that the assessments against Classics are not ultimately upheld in the appeal process."

In its opinion, the Tax Court stated that appellants relied on several differences between the facts in this case and the facts in *SYL*. The court characterized the decision in *SYL* by stating "the Court found nexus existed [between the State and] the subsidiary holding corporation based on the existence of the parent within Maryland and the fact that the subsidiary had

---

1. Subsections (c) and (d) provide methods of apportionment to determine the appropriate amount of State taxable income. The question of apportionment is not an issue in the case before us.

2. Talbots filed State income tax returns for the years in question, while Classics did not file returns. Thus, appellee could not make as assessment against Talbots after 3 years from the date a return was filed. TG § 13–1101(a). Appellee was not so limited as to Classics because Classics had not filed returns. TG § 13–1101(b).

no economic substance." The Tax Court then recited the asserted factual differences, taken largely from the stipulation.

After reviewing the factual differences, the Tax Court stated, in pertinent part:

The primary factual distinction from those presented in *Syl, Inc.* is that the trademarks first were transferred from the parent to a foreign holding company, Jusco BV, in order to take advantage of favorable accounting treatments in that country, according to the Petitioners. The ownership of the trademarks was then transferred to the domestic subsidiary Classics from Jusco BV and the Petitioners cite numerous business reasons: the transfer maximizes the value of Talbot's stock at the time of the IPO; a domestic subsidiary holding the trademarks gives Talbots greater growth flexibility in its business; Classics ownership of the Talbots trademarks allows Talbots to sell geographical rights to the trademarks to other business ventures, and Talbots gets a captive revenue stream of royalty payments into the subsidiary that can be used as collateral for loans.

Petitioners argue that this factual distinction from the facts in *SYL, Inc.* evidences that there was no motivation on behalf of Talbots, at the time of entering into the transaction with Classics, of avoiding the payment of state taxes. On the contrary, Petitioners note that the transfer of the trademarks back to a domestic subsidiary subjected the holding company, Classics, to state tax liability in those states utilizing the unitary combined reporting approach, which liability Jusco BV, as a foreign entity did not have. Since there were no state tax advantages to the structuring of the trademark transactions and no subjective motivation to avoid taxes was apparent, based on the *SYL, Inc.* decision, Petitioners assert nexus does not exist and the assessments should be reversed.

Petitioners are asserting that the federal "sham doctrine" applies based on the holding in *SYL, Inc.* That doctrine examines the transactions involved and invalidates those designed solely to skirt income taxes. Petitioners claim the sham doctrine looks to the subjective motivations of the

transactions and if those motivations are for no other reasons than tax avoidance, than [sic] the transactions are voided. Petitioners point to the evidence in this case indicating the motivating factors behind and at the time of the creation of Classics, such as to protect the trademarks, to assure a protected revenue stream and provide potential collateral for Talbots, as proof that the transactions were not a sham. According to Petitioners, the *SYL, Inc.* transactions can be distinguished in that in that situation, the tax avoidance motivations were disclosed at the time the transactions were entered and were predominant.

While reference to the sham doctrine is made by the Court of Appeals in *SYL, Inc.* while citing a Massachusetts Supreme Judicial court decision, *SYL, Inc.* does not establish the sham doctrine as the standard to be applied when determining nexus of affiliated entities. Without specific direction from the Court of Appeals, this Court will not rely on the sham doctrine. Rather the test applied is whether the out-of-state affiliates had "real economic substance as separate business entities," [sic] *SYL, Inc. supra* at 106, 825 A.2d 399.

Similar to the entities involved in *SYL, Inc.*, Talbots may have had legitimate business purposes, other than tax avoidance, to fund the payment from Classics to Jusco BV for the trademarks (rather than purchase them itself). However we are directed to examine the substance of the resulting subsidiary. The evidence indicates that Classics had minimal operating expenses during the eleven year period in question. There were little or no expenses for compensation for officers, salary, wages and cost of labor and minimum expenditures for travel, maintenance, professional services, service charges, directors' fees and rent. The minimal expenses greatly contrasts with the significant amount of royalty income reported.

The transactions generating the income and deductions in question were all inter-company. Classics royalty income resulted from transactions by its parent Talbots and there was no other income generated. Classics relied entirely on

its parent for performance of ordinary business operations. The transactions at issue were simply the payment of a significant royalty by a parent to its wholly owned subsidiary, followed by a substantial repayment by the subsidiary to the parent in the form of a dividend.

As this was essentially the fact scenario as that presented to the Court of Appeals in *SYL. Inc.*, we find that Classics lacks real economic substance as a separate business entity. Thus, the activities of Classics must be viewed through the activities of its operating parent, Talbots, and, as such, there are substantial activities of the holding company, Classics, within Maryland. Therefore, Classics has constitutional nexus with Maryland and the assessments against both Classics and Talbots must be affirmed.

Appellants filed a petition for judicial review in circuit court. The court held a hearing on October 8, 2008, and by order dated October 10, 2008, affirmed the Tax Court's decision. This timely appeal followed.

### Standard of Review

"Despite its name, the Tax Court is not a court; instead, it is an adjudicatory administrative agency in the executive branch of state government." *Furnitureland South, Inc. v. Comptroller of the Treasury*, 364 Md. 126, 138 n. 8, 771 A.2d 1061 (2001) (citations omitted); *see also State Dep't of Assessments and Taxation v. Consolidation Coal Sales Co.*, 382 Md. 439, 453, 855 A.2d 1197 (2004) ("Because the Maryland Tax Court is an administrative agency, '[t]he standard of review for Tax Court decisions is generally the same as that for other administrative agencies.'") (Quoting *Supervisor of Assessments v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 461, 842 A.2d 732 (2004)). Our inquiry "is not whether the circuit court erred, but rather whether the administrative agency erred." *Comptroller of the Treasury v. Clise Coal, Inc.*, 173 Md.App. 689, 697, 920 A.2d 561 (2007) (citation omitted). We thus undertake our own de novo review of the decision of the Tax Court. *Maryland Bd. of Physicians v. Elliott*, 170 Md.App. 369, 400, 907 A.2d

321, *cert. denied,* 396 Md. 12, 912 A.2d 648 (2006) (quoting *Pollard's Towing, Inc. v. Berman's Body Frame & Mech., Inc.,* 137 Md.App. 277, 287, 768 A.2d 131 (2001)).

Our review is narrow, *Finucan v. Maryland State Bd. of Physician Quality Assurance,* 151 Md.App. 399, 411, 827 A.2d 176 (2003), aff'd, 380 Md. 577, 846 A.2d 377 (2004), and is " 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376 (1999) (quoting *United Parcel Serv. v. People's Counsel for Baltimore County,* 336 Md. 569, 577, 650 A.2d 226 (1994)). It is not our job to substitute our judgment for that of the Tax Court. *See Maryland–National Capital Park and Planning Comm'n v. Anderson,* 395 Md. 172, 180–81, 909 A.2d 694 (2006) (The reviewing court " 'must not itself make independent findings of fact or substitute its judgment for that of the agency' ") (quoting *Baltimore Lutheran High School Ass'n v. Employment Security Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985)); *United Parcel,* 336 Md. at 576–77, 650 A.2d 226 ("The court's task on review is not to " 'substitute its judgment for the expertise of those persons who constitute the administrative agency." ' ") (Quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119 (1978)) (quoting *Bernstein v. Real Estate Comm'n,* 221 Md. 221, 230, 156 A.2d 657 (1959), appeal dismissed, 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960)) (emphasis in *United Parcel* ).

We are not bound by the Tax Court's interpretation of the law. *Gigeous v. Eastern Corr. Inst.,* 363 Md. 481, 496, 769 A.2d 912 (2001). We review the Tax Court's conclusions of law de novo for correctness. *Schwartz v. Maryland Dep't of Natural Res.,* 385 Md. 534, 554, 870 A.2d 168 (2005). "Determining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it adminis-

ters." *Christopher v. Montgomery County Dep't of Health and Human Services*, 381 Md. 188, 198, 849 A.2d 46 (2004) (citations omitted); *see also Maryland Aviation Admin. v. Noland*, 386 Md. 556, 573, 873 A.2d 1145 (2005) (" 'Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.' ") (Quoting *Banks*, 354 Md. at 67–69, 729 A.2d 376).

Moreover, "[a]n administrative agency may be affirmed only on the basis of the grounds on which it decided the case." *Dep't of Health and Mental Hygiene v. Campbell*, 364 Md. 108, 111 n. 1, 771 A.2d 1051 (2001) (citations omitted); *see also Evans v. Burruss*, 401 Md. 586, 593, 933 A.2d 872 (2007) (" 'in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency' ") (quoting *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984)), cert. denied, —— U.S. ——, 128 S.Ct. 1309, 170 L.Ed.2d 73 (2008); *County Council of Prince George's County Sitting as District Council v. Brandywine Enters.*, 350 Md. 339, 349, 711 A.2d 1346 (1998) ("we will review an adjudicatory agency decision solely on the grounds relied upon by the agency") (citations omitted).

Finally, "recognizing that the agency's decision is 'prima facie correct and presumed valid,' 'we must review the agency's decision in the light most favorable to it.' " *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 163, 884 A.2d 112 (2005) (quoting *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 835, 490 A.2d 1296 (1985)); see also T.G. 13–411 ("[a]n assessment of a tax is prima facie correct"). (Footnote Omitted.).

*Frey v. Comptroller of the Treasury*, 184 Md.App. 315, 330–332, 965 A.2d 923, *cert. granted*, 409 Md. 46, 972 A.2d 861 (2009).

Appellants contend that the relevant facts in the case before us are undisputed and the question is one of law; thus, no deference is owed to the Tax Court. Appellants explain that the sole question is whether there is sufficient nexus between Classics and this State so that the imposition of State income tax does not violate the Commerce Clause of the United States Constitution or principles of due process. A sub-question is whether the Tax Court properly applied the test in *SYL* that is to be utilized in making that determination.

Appellee recites the general standard of review but characterizes the applicable standard as "narrow and deferential."

■■ The extent to which this State has the ability to tax a nonresident under the United States Constitution is a question of law on which we owe no deference. *AT&T v. Communs. of Md. Inc. v. Comptroller of the Treasury*, 405 Md. 83, 93, 950 A.2d 86 (2008); *Syl*, 375 Md. at 101, 825 A.2d 399. As we understand appellants' position, they are not arguing that this State cannot constitutionally impose the income tax in question because of binding Supreme Court precedent but rather that the Tax Court misinterpreted State law as set forth in *SYL* which set forth the test for making that determination. That, too, is a question of law. To the extent that question is dependent on findings of fact or resolution of mixed questions of law and fact, we shall give appropriate deference.

## Discussion

■■ A state's ability to tax a nonresident entity is limited by the Commerce Clause and principles of due process. *SYL*, 375 Md. at 80, 825 A.2d 399. "When a state wishes to tax an entity located beyond its borders .... [t]here must exist a 'substantial nexus'- a 'definitive link'-between the state and the person or transaction it seeks to tax." (Citations omitted). *AT&T*, 405 Md. at 94, 950 A.2d 86; *Hercules, Inc. v. Comptroller of the Treasury*, 351 Md. 101, 109–110, 716 A.2d 276 (1998).

In the case before us, the assessment against Classics was not based on any physical presence of Classics in this State,

but rather by attributing Talbots' physical presence to Classics, its subsidiary. Thus, the *SYL* decision is very relevant because it addressed that situation.

### The SYL Decision

The *SYL* opinion encompassed two consolidated cases. One case involved Syms Corporation and SYL, Inc. its wholly owned subsidiary. The other case involved Crown Cork & Seal Company, Inc. and Crown Cork & Seal (Delaware), its wholly owned subsidiary.

In both cases, the parents incorporated the subsidiaries, assigned intellectual property assets to them, and licensed use of the assets from the subsidiary in exchange for the payment of royalties. The parents did business in this State, but the subsidiaries had no physical presence in this State. The subsidiaries owned minimal tangible property and incurred minimal management and operating expense. *SYL*, 375 Md. at 81 and 92, 825 A.2d 399. There was evidence that the arrangements were formed for non-tax business reasons and for tax reasons, including avoiding State income tax. *Id.* at 90 and 97, 825 A.2d 399.

The Court of Appeals observed that the reach of TG § 10–402 is synonymous with that permitted by the Constitution. *Id.* at 100, 825 A.2d 399. The *SYL* Court, relying primarily on this Court's opinion in *Comptroller v. Armco*, 82 Md.App. 429, 572 A.2d 562 (1990), held that the subsidiaries in the cases before it could constitutionally be taxed by this State, concluding that they lacked "real economic substance as separate business entities." *Id.* at 106, 572 A.2d 562.

The Court then stated:

[The subsidiaries] resembled the subsidiaries involved in the *Armco* case, except that [the subsidiaries] had a touch of "window dressing" designed to create an illusion of substance. Neither subsidiary had a full time employee, and the ostensible part time "employees" of each subsidiary were in reality officers, or employees of independent "nexus-service" companies. The annual wages paid to these

"employees" by the subsidiaries were minuscule. The so-called offices in Delaware were little more than mail drops. The subsidiary corporations did virtually nothing; whatever was done was performed by officers, employees, or counsel of the parent corporations. The testimony indicated that, with respect to the operations of the parents and the protections of the trademarks, nothing changed after the creation of the subsidiaries. Although officers of the parent corporations may have stated that tax avoidance was not the sole reason for the creation of the subsidiaries, the record demonstrates that sheltering income from state taxation was the predominant reason for the creation of [the subsidiaries].

*Id.*

The Court then discussed cases from other jurisdictions, stating that other courts "have also upheld the application of state income tax laws with respect to a portion of the income of out-of-state subsidiaries having the sole function of owning their parents' trademarks." *Id.* Specifically, the Court discussed *Syms Corp. v. Comm'r of Revenue*, 436 Mass. 505, 765 N.E.2d 758 (2002), *Geoffrey, Inc. v. South Carolina Tax Commission*, 313 S.C. 15, 437 S.E.2d 13 (1993), and *Kmart Props., Inc. v. Taxation and Revenue Dep't of New Mexico*, 131 N.M. 564, 40 P.3d 1008 (2002) (decision without published opinion). We will discuss those cases after we outline the position of the parties in the case before us.

### Appellants' position

Appellants observe that Classics was formed for essentially the same reasons as Jusco BV before it. Classics "was formed for business purposes unrelated to state income tax generally or the Maryland corporate income tax specifically." It "was formed as a special purpose entity to acquire the Talbots trademarks from Jusco BV to solidify Talbots' market position as an entity independent from Jusco," to enhance the value of Talbots' stock, and to demonstrate a capacity to secure future financing. With respect to the latter, Classics assets could serve as collateral for financing. According to appellants,

Talbots did not analyze the tax consequences until after the decision had been made, based on non-tax reasons. Appellants also observe that as a result of the formation of Classics, state taxable income was not reduced, and in fact, Talbots would have experienced a more favorable tax situation if it had continued to license the Talbots trademarks from Jusco BV. This is because Jusco BV paid no state income tax, and Classics paid substantial state income tax. The point of the above observations is that Talbots was not motivated by state tax considerations.

Appellants contend that the facts before us are distinguishable from the facts in *SYL* and, thus, compel a different result. Appellants point out that, unlike the facts in *SYL,* (1) Classics did not acquire the Talbots trademarks from Talbots in a transfer and license back arrangement; (2) the formation of Classics was not tax-motivated and produced non-tax benefits; (3) the creation of Classics did not create new tax savings; and, (4) Talbots and Classics "did not structure their relationship so as to undermine the purposes for which Classics was formed." As to the last point, appellants assert that, in SYL, the subsidiaries were formed for the ostensible purpose of improving trademark management but were contractually prevented from performing those functions; they continued to be performed by the parents. In contrast, appellants assert that Talbots and Classics conducted their relationship at arm's length.

Appellants argue that if SYL is read in the way they urge us to read it, the Tax Court erred in not applying the correct standard, and application of the correct standard compels a different result. Distilled to its essence, appellants' position is that when the Court of Appeals evaluated "the real economic substance" of the corporations before it "as separate business entities" it adopted the "sham doctrine." The "sham doctrine" has been recognized in several cases, mostly federal, and provides that a transaction may be disregarded for tax purposes if the taxpayer was motivated solely by obtaining tax benefits and the transaction had no economic substance or benefits aside from the tax consequences. *See BB&T Corp. v.*

*United States,* 523 F.3d 461, 471 (4th Cir.2008). In other words, appellants assert that because there are several federal cases in which the courts used the terms "real economic substance" when referring to a sham transaction, the Court of Appeals adopted the sham transaction test, and it requires a finding that Talbots' motivation was to obtain tax benefits. In addition, appellants point to the fact that the *SYL* Court quoted extensively from the decision by the Supreme Judicial Court of Massachusetts in *Syms Corp,* in which it held that the relationship between Syms and SYL was a sham because the transaction was for the creation of tax benefits. Finally, appellants point out that the *SYL* Court also relied on *Armco,* in which the transactions were motivated by tax benefits.

### Appellee's Position

Appellee emphasizes that the existence of Classics as a separate holding company affects tax savings to Talbots and assert that appellants lack economic substance as separate entities, but it does not expressly contest appellants' position that the transactions were not motivated by tax considerations. Appellee contends the Tax Court properly applied the "real economic substance as separate business entities" test set forth in *SYL* and reached the right result. Appellee points out that, as in *SYL,* (1) the transactions were inter-company; (2) the income was from intangible sources; (3) the royalty income resulted from transactions by the subsidiary's operating parent, and no other income was generated; (4) the subsidiary relied on the parent for ordinary business operations; and, (5) the parent and the subsidiary were unitary.

Appellee relies on cases from other jurisdictions in which the courts have upheld the application of state income tax laws to an appropriate portion of the income of out-of-state companies holding their parent's trademarks. These cases, according to appellee, are premised on "the purposeful exploitation of intangible property in the taxing state." *See, e.g., Geoffrey, Inc. v. Commissioner of Revenue,* 453 Mass. 17, 899 N.E.2d 87, 92–93 (2009). Appellee argues that Maryland has not adopted the two part sham transaction test advocated by

appellants and that the cases relied on by appellants did not enunciate that test. Rather, the courts focused on economic effects. Appellee contends that, even if the *SYL* Court applied the two prong sham transaction test, the difference between the facts in this case and the facts in *SYL*, as argued by appellants, do not produce a different result in this case. In that connection, appellee explains that the effect of the transactions is the same, *i.e.*, by licensing trademarks for use in Maryland and deriving income from their use here, Classics has a substantial nexus with Maryland.

### Analysis

■■ We begin with the proposition that it is clear the legislative purpose underlying TG § 10–402 is to tax multistate corporations doing business in this State to the full extent permitted by the United States Constitution. *Syl*, 375 Md. at 100, 825 A.2d 399; *Hercules*, 351 Md. at 110, 716 A.2d 276; *NCR Corp. v. Comptroller of the Treasury*, 313 Md. 118, 146, 544 A.2d 764 (1988). This means the issue is determined by the Commerce Clause, which requires a substantial nexus, and principles of due process, which require minimum contacts. The Commerce Clause requirements address states' impact on the national economy, and the due process requirements are concerned with fairness. An entity may have minimum contacts with a state but not have a substantial nexus.

The two pronged sham transaction test urged by appellants originated under federal taxation law and not under the limitations imposed on states by the Commerce Clause. Even in that context, it is unclear whether courts have applied one doctrine or multiple doctrines. Courts have used the terms "sham transaction," "economic substance," and "substance over form," sometimes as different concepts and sometimes as synonymous concepts. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561, 573–584 (1978); *BB&T Corp.*, 523 F.3d at 471–472.

▮ Consistent with the fact that Maryland's income tax laws reach to the extent permitted by the Commerce Clause, we do not read *SYL* in the way appellants urge us to read it. The Court of Appeals did not adopt a "two prong sham transaction" test but consistent with the trend in caselaw, looked to the economic substance, in terms of the practical effect of the transactions in question. While relevant, the motivation behind the transactions is not necessarily dispositive.

Aside from *Syms*, the cases cited by the *SYL* Court did not discuss a two pronged sham doctrine. In *Armco,* the subsidiaries in question were formed to take advantage of a federal tax law designed to encourage exports. 82 Md.App. at 430–431, 572 A.2d 562. The law permitted a type of artificial accounting between a parent and its subsidiary to provide a tax benefit. *Id.* The subsidiaries did not have a physical presence in this State, and did not file State income tax returns. The parents did business in this State and filed State income tax returns. *Id.* at 431–432, 572 A.2d 562. The Comptroller asserted that a substantial nexus existed between the subsidiaries and their parents based on "economic reality" and specifically the fact that the parents were engaged in the export business in this State which produced the subsidiaries' income. *Id.* at 432, 572 A.2d 562. This Court agreed, explaining that a substantial nexus existed, based on the business conducted in this State by "unitary corporate affiliates." *Id.* at 437, 572 A.2d 562. This Court did not discuss the sham transaction test urged by appellants.

In *Geoffrey v. South Carolina Tax Commission,* a subsidiary of Toys R Us, Inc. was the holder of Toys R Us trademarks. Geoffrey, the subsidiary, had no offices or employees in South Carolina and did not own any tangible property there. Geoffrey challenged the imposition of state income taxes on the ground that it had no substantial nexus with the state. 437 S.E.2d at 15. The court found a substantial nexus in the fact that Geoffrey licensed intangibles for use in the state and derived income from their use. *Id.* The court did not discuss the sham transaction test urged by appellants.

With respect to the *Kmart Props* decision, as of the filing of the *SYL* opinion, certiorari had been granted by the Supreme Court of New Mexico but stayed because of a bankruptcy proceeding. Subsequent to the filing of the *SYL* opinion, the Supreme Court of New Mexico authorized the publication of the intermediate court's opinion and quashed certiorari with respect to the income tax issue, the only issue relevant to this case. *Kmart Corp. v. Taxation and Revenue Dept. of New Mexico*, 139 N.M. 172, 131 P.3d 22 (2005). Thus, the intermediate court's opinion remains viable with respect to the income tax issue and appears as *Kmart Props., Inc. v. Taxation and Revenue Dept. of New Mexico*, 139 N.M. 177, 131 P.3d 27 (filed 2001, released for publication 2006).

In that case, Kmart Properties, Inc., a wholly owned subsidiary of Kmart Corporation, challenged the assessment of state income taxes upon royalties paid by Kmart Corporation to Kmart Properties, Inc., the holder of Kmart Corporation trademarks. *Kmart Props.*, 131 P.3d at 30. In upholding the imposition of the income tax, the intermediate appellate court did not base its decision on the existence of a sham transaction requiring the elements urged by appellants. Rather, it concluded that a substantial nexus existed between the holder of the trademarks and the state based on the use of trademarks by Kmart Corporation within the state for the purpose of generating income for Kmart Properties, which had no operations in the state. *Id.* at 36.

Thus, the *SYL* Court relied on cases upholding taxation of income received by holding companies of intellectual property when the intellectual property rights were used in the taxing state and produced income. The Court of Appeals did not adopt the two prong sham transaction test urged by appellants. A sham transaction under that test would result in taxation, but the fact that the transaction was not subjectively motivated by a desire to save taxes does not necessarily mean that the transaction is not subject to state taxation.

As can be readily seen, the basis of a nexus sufficient to justify taxation, in the above cases, was the economic reality of

the fact that the parent's business in the taxing state was what produced the income of the subsidiary. Other recent cases have reached this same conclusion. *See, e.g., Tax Comm'r of the State of West Virginia v. MBNA America Bank,* 220 W.Va. 163, 640 S.E.2d 226, 234 (2006), (adopted "significant economic presence" test to determine existence of substantial nexus for Commerce Clause purposes), *cert. denied FIA Card Services NA v. Tax Comm'r,* 551 U.S. 1141, 127 S.Ct. 2997, 168 L.Ed.2d 719 (2007); *A & F Trademark, Inc. v. Tolson,* 167 N.C.App. 150, 605 S.E.2d 187, 195, (existence of substantial nexus based on licensing of trademarks to a related company in the taxing state), *cert. denied,* 546 U.S. 821, 126 S.Ct. 353, 163 L.Ed.2d 62 (2005).

The Tax Court did not apply the wrong test, and it did not err in concluding that a substantial nexus existed between Classics and this State, sufficient to apply this State's income tax laws.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**