60 A.3d 107

COMPTROLLER OF the TREASURY

v.

GORE ENTERPRISE HOLDINGS, INC.

Comptroller of the Treasury

v.

Future Value, Inc.

Nos. 1696, 1697, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Jan. 24, 2013.

**526** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

Michael J. Salem (Douglas F. Gansler, Atty. Gen., on the brief) Annapolis, MD, for appellant.

Jeffrey A. Friedman (Michele Borens, G. Brendan Ballard, Sutherland, Asbill & Brennan, Robert F. Reklaitis, Cynthia F. Crawford, LeClair Ryan, on the brief) Washington, DC, for appellee.

Panel: MATRICCIANI, BERGER and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

On November 9, 2010, the Maryland Tax Court [1] upheld a tax assessment against Gore Enterprise Holdings, Inc., in the amount of $10,013,428 plus interest, but the Tax Court abated penalties of $2,503,360. The Tax Court simultaneously upheld an assessment against Future Value, Inc., of $1,254,321 plus interest, while abating $313,581 in penalties. Both parties appealed to the Circuit Court for Cecil County, where the cases were consolidated. The circuit court reversed the Tax Court's assessments on September 30, 2011, and the Comptroller timely appealed on October 6, 2011.

### QUESTIONS PRESENTED

The Comptroller presents the following questions for our review, which we have rephrased and consolidated to comport with our discussion:

I. Did the Tax Court err when it held that patent royalties and interest income claimed as expenses in Maryland and paid to wholly-owned foreign subsidiaries are taxable as part of a unitary business?

II. Did the Tax Court err when it apportioned the subsidiaries' income based on the parent corporation's apportioned expenses? [2]

---

**1.** The Maryland Tax Court is an independent administrative unit of the State government and consists of five judges appointed by the Governor. Md.Code (1988, 2010 Repl.Vol.), §§ 3–102, 3–106 of the Tax—General Article ("TG").

**2.** The Comptroller's questions presented in its brief are:

For the reasons that follow, we answer no to both questions and we reverse the judgments of the Circuit Court for Cecil County cancelling the assessments.

## FACTUAL AND PROCEDURAL HISTORY

### W.L. Gore & Associates, Inc.

In 1958, Dr. Wilbert L. Gore founded and incorporated W.L. Gore & Associates, Inc. ("Gore" or "Gore, Inc.") in Newark, Delaware. Gore is known for its patented "ePTFE" material, which it uses to manufacture industrial and electronic products, as well as fabrics and medical devices. Gore attributes income to Maryland based on its local product sales and on its manufacturing facilities, which employ over two-thousand people in this state.

In the same year that Gore was founded, Delaware amended its income taxation statute to exempt "[c]orporations whose activities within Delaware are confined to the maintenance and management of their intangible investments and the collection and distribution of the income from such investments or from tangible property physically located outside of Delaware." 51 Del. Laws, c. 315, § 3 (available at http://delcode.delaware.gov/sessionlaws/ga119/chp315.shtml); 30 Del. C. § 1902(b)(8) (2012). Delaware later added the following clarifying language to the end of § 1902(b)(8):

1. Do patent royalties produced by a unitary business activity that takes place in Maryland have a "minimal connection" and "rational relationship" to Maryland such that the royalties are subject to Maryland taxation under the Commerce Clause?
2. Does the interest income generated by [Future Value, Inc. ("FVI")]'s loans to [W.L. Gore & Associates, Inc. ("Gore")] bear a sufficient nexus to Gore's Maryland operations when the money used to capitalize FVI consists of royalty payments on Gore's patents, and when the money FVI loans back to Gore is used for Gore's operations in Maryland?
3. Does substantial evidence support the Tax Court's factual findings that [Gore Enterprise Holding, Inc.]'s accumulation of royalty income from the Gore patents does not qualify it as an independent business connected to Gore's Maryland activity and that the apportionment is fair?

For purposes of this paragraph "intangible investments" shall include without limitation investments in stocks, bonds, notes and other debt obligations (including debt obligations of affiliated corporations), patents, patent applications, trademarks, trade names and similar types of intangible assets.

30 Del. C. § 1902(b)(8) (2012); 64 Del. Laws, c. 461, § 10 (available at http://delcode.delaware.gov/sessionlaws/ga132/chp 461.shtml).

## Gore Enterprise Holdings, Inc.

Gore formed Gore Enterprise Holdings, Inc. ("GEH") in 1983, contributing all Gore patents in exchange for all of GEH's stock. Gore's November 4, 1983 board meeting notes include the following comment:

*Item 7.* Gore Enterprise Holdings, Inc.

The directors UNANIMOUSLY APPROVED the action of the Executive Committee in establishing the Gore Enterprise Holdings, Inc. corporation and transferring our patents and overseas receipts to this holding company. The holding company should result in substantial savings of Delaware state income tax but will have no effect on our Federal income tax.

GEH is governed by a board of directors comprising Gore, Inc.'s patent attorney, a "tech leader" from Gore, the president of GEH, and Dr. Gore, himself. The board has never included an outside director, and all of GEH's activities are ultimately directed by the board.

GEH operated without any employees or rent expenses until 1995, when it hired one salaried employee and began to pay Gore, Inc. for the use of a one-hundred-twenty square foot room on Gore's premises. At that time, Gore agreed to provide its subsidiary, GEH, with various administrative services, including accounting, payroll, employee benefits, and "general services," in return for a $100 monthly fee (later raised to $105). The parties simultaneously entered into a

"Legal Services Consulting Agreement" that obligates Gore to provide GEH with various services, including:

- Prosecution of patent applications, domestic and foreign.

- Conduct or manage litigation or defense of patents against infringement.

- Provide advice with respect to utilization of outside counsel.

- Counsel, conduct or manage applications to foreign patents and applications.

- Counsel with respect to patent infringement, domestic and foreign.

- Counsel with respect to interferences with pending patents.

- Counsel with respect to licensing negotiations and activities.

In return, the Agreement obligates GEH to pay Gore at an hourly rate determined either by a survey of the American Intellectual Property Law Association or by good faith negotiations that would "reflect an arm's-length transaction."

When Gore employees develop a new technology and decide that it is commercially viable, attorneys working under the Legal Services Agreement and on behalf of GEH prepare and file a patent application covering that invention. At that point, GEH's lone employee assumes responsibility for all requisite documentation and correspondence.

GEH's operations are controlled by an "intellectual property committee," which consists of officers from GEH and Gore, Inc. (to the extent that there is some distinction between the two). The committee oversees licensing of GEH's patents to Gore and to third parties, as well as acquisition of patents from third parties, and enforcement of its patent portfolio.

At its inception, GEH granted Gore "an exclusive license to make, use and sell any patented inventions under all U.S. patents presently owned or hereafter acquired by the [GEH] insofar as the United States and all its territories and posses-

sions are concerned."[3] In exchange, Gore pays GEH a "reasonable fee" and deducts that expense from its taxable income.[4] GEH, meanwhile, recognizes these royalty payments as taxable income.[5] Between 1996 and 2007, GEH returned dividends of approximately $5.5 million per month to Gore, Inc.

### Future Value, Inc.

In 1996, Gore exchanged its financial assets in return for all outstanding stock of its newly-formed subsidiary, Future Value, Inc. ("FVI"). Since its inception, FVI has been funded entirely by contributions from Gore and GEH, and by reinvesting its investment income. A portion of that investment income is derived from loans FVI makes to Gore, Inc. Gore deducts its interest payments to FVI from Gore's taxable income;[6] FVI recognizes those payments as taxable income.

### Audits by the Comptroller

In 2006, the Comptroller audited Gore, GEH, and FVI and determined that GEH and FVI were required to apportion income to Maryland. The Comptroller took the ratio that Gore used to apportion its Maryland income and expenses—including royalties and interest paid to its subsidiaries—and applied it to GEH's and FVI's federal taxable income derived from Gore.[7] The Comptroller assessed against GEH $26,436,315, and assessed against FVI $2,608,895, both including interest and penalties. The Comptroller also conducted an

---

3. Gore retains "the right to grant sublicenses without restriction."

4. The Internal Revenue Code ("IRC"), 26 U.S.C. § 162, allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]"

5. *See* IRC § 61.

6. IRC § 163 allows a taxpayer to deduct "all interest paid or accrued within the taxable year on indebtedness."

7. The Comptroller excluded any of the subsidiaries' income that did not originate from their parent, Gore.

"alternative audit" of Gore that disallowed royalty and interest expenses paid to its subsidiaries, and assessed against Gore $193,718, including interest and penalties.[8]

A hearing officer in the Comptroller's office upheld the assessments on January 5, 2007, and GEH and FVI appealed to the Maryland Tax Court.

The Tax Court conducted an extensive, three-day hearing in October, 2008. The Tax Court explained its ruling in a memorandum that followed:

> Maryland courts have consistently concluded that the basis of a nexus sufficient to justify taxation is the economic reality of the fact that the parent's business in Maryland was what produced the income of the subsidiary. *The Classics Chicago, Inc., et. al v. Comptroller of the Treasury*, 189 Md.App. [695, 985 A.2d] 593 (2010); *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78 [825 A.2d 399], cert. denied, 540 U.S. 984 [124 S.Ct. 478, 157 L.Ed.2d 375] and 540 U.S. 1090 [124 S.Ct. 961, 157 L.Ed.2d 795] (2003). Thus, the resolution of this case depends on whether GEH and FVI as out-of-state affiliates had real economic substance as business entities separate from W.L. Gore.

> This Court's previous interpretation of the facts support the Comptroller's position that GEH and FVI were engaged in a unitary business with W.L. Gore and are not separate business entities. GEH and FVI depend on W.L. Gore for their existence. The facts indicate functional integration and control through stock ownership, as well as common employees, directors and officers of W.L. Gore and the Gore family. The functional source of GEH's income is derived from the ideas and discoveries generated by W.L. Gore employees. The circular flow of money is traced by and through W.L. Gore when GEH acquires a patent from the ideas and discoveries of W.L. Gore. The income of GEH is

---

8. These assessments were disproportionate due to the Comptroller's determination that Gore had filed tax returns that triggered the three-year statute of limitations under TG § 13–1101(a), while GEH and FVI had not.

derived from a royalty paid by W.L. Gore under a license agreement on the patent.

In addition, the facts also indicate GEH's reliance on W.L. Gore personnel, office space and corporate services. The tax returns and other financial data reflect the lack of separate substantial activity of GEH or FVI. Moreover, the evidence also demonstrates that FVI is taxable by Maryland on its intercompany loan income. FVI is inextricably connected to the royalty income generated by W.L. Gore and paid to GEH. There is a circular flow of money through royalties, dividends and loans which support the unitary business of W.L. Gore and its wholly owned subsidiaries, GEH and FVI.

The Court finds that substantial nexus exists between GEH and FVI with the State of Maryland, and that the Comptroller has fairly apportioned the tax on income through its apportionment formula.

The Tax Court affirmed the assessments of tax and interest against GEH and FVI, but abated all penalties and dismissed the alternative assessment against Gore, Inc. GEH and FVI then appealed to the Circuit Court for Cecil County, which reversed the Tax Court and cancelled the Comptroller's assessments in both cases.[9] The Comptroller appealed on October 6, 2011, bringing both disputes before this Court.

---

**9.** The circuit court held that Gore and GEH were not a unitary business and that there was no evidence "that GEH does any business at all in the State of Maryland that would allow the Comptroller to tax it." The court explained that "[i]t's probably good business sense to have the same people involved in terms of having an alignment of the good of all the Gore companies, but I don't believe that that makes it in any way less of an independent company" because GEH has an "independent business purpose" and "its own independent business dealings." Similarly, the circuit court held that each loan between FVI and Gore was "an arm's length transaction between two Delaware residents; and therefore, it shouldn't be subject to Maryland tax." The circuit court also held that when the Tax Court ruled on the GEH assessment, it erroneously relied on precedent from trademark cases because a "trademark actually helps to sell something in the marketplace," whereas a patent does not and merely "cuts off competition in the marketplace from other parties."

## DISCUSSION

### Standard of Review

Judge James Eyler recently summarized the standard of review governing appeals from the Tax Court in *Classics Chi., Inc. v. Comptroller of the Treasury:*

> Despite its name, the Tax Court is not a court; instead, it is an adjudicatory administrative agency in the executive branch of state government. Our inquiry is not whether the circuit court erred, but rather whether the administrative agency erred. We thus undertake our own de novo review of the decision of the Tax Court.
>
> Our review is narrow and is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. It is not our job to substitute our judgment for that of the Tax Court.
>
> We are not bound by the Tax Court's interpretation of the law. We review the Tax Court's conclusions of law de novo for correctness. Determining whether an agency's "conclusions of law" are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers.
>
> Moreover, an administrative agency may be affirmed only on the basis of the grounds on which it decided the case.
>
> Finally, recognizing that the agency's decision is prima facie correct and presumed valid, we must review the agency's decision in the light most favorable to it.

189 Md.App. 695, 705–07, 985 A.2d 593 (2010) (citations and quotation marks omitted).

---

The circuit court also addressed two ancillary matters. First, the court held that the Comptroller's apportionment was "not supported by facts or the law." Second, the circuit court held that the statute of limitations had expired as to GEH and FVI because it was inconsistent to consider them part of a unitary business with Gore but also require them to file separate income tax returns.

Where, as here, the operative facts before the administrative agency are undisputed, the legal conclusion based on those facts has been treated as an issue of law. *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, 105, 825 A.2d 399 (2003).

## I.

 The statute at the foundation of this case is TG § 10–402, which taxes a corporation's income [10] "derived from or reasonably attributable to its trade or business in this State[.]" That section has undergone various changes in the two decades spanning this dispute, but its purpose has always been to tax multi-state corporations doing business in this State to the full extent permitted by the United States Constitution. *Classics*, 189 Md.App. at 713, 985 A.2d 593 (citing *SYL*, 375 Md. at 100, 825 A.2d 399; *Hercules Inc. v. Comptroller of the Treasury*, 351 Md. 101, 110, 716 A.2d 276 (1998); *NCR Corp. v. Comptroller of the Treasury*, 313 Md. 118, 146, 544 A.2d 764 (1988)). There are two constitutional limits upon Maryland's power to tax under TG § 10–402:

The Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities. The Due Process Clause demands that there exist some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax, as well as a rational relationship between the tax and the values connected with the taxing State. The Commerce Clause forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. The broad inquiry subsumed in both constitutional requirements is whether the taxing power exerted by the state bears fiscal relation to protection,

---

**10.** Maryland taxable income is, generally, a "corporation's federal taxable income for the taxable year as determined under the Internal Revenue Code and as adjusted under this Part II of this subtitle." TG §§ 10–101(i)(2), 10–304(1).

opportunities and benefits given by the state—that is, whether the state has given anything for which it can ask return.

*MeadWestvaco Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 24–25, 128 S.Ct. 1498, 170 L.Ed.2d 404 (2008).

▮▮▮▮ A state may tax an apportioned sum of the corporation's multistate business if the business is "unitary." *MeadWestvaco*, 553 U.S. at 25, 128 S.Ct. 1498. The test in any case is thus whether intrastate and extrastate activities formed part of a single unitary business, or whether the out-of-state values that the State seeks to tax derive from unrelated business activity which constitutes a discrete business enterprise. *Id.* (citations omitted). The "hallmarks" of a unitary relationship are: 1) functional integration, 2) centralized management, and 3) economies of scale. *Id.* at 30, 128 S.Ct. 1498; *SYL*, 375 Md. at 100, 825 A.2d 399.[11]

---

11. Appellees argue that the Tax Court conflated the "unitary business principle" with "the real economic substance test." To that end, they contend that the unitary business principle does *not* satisfy the due process "nexus" requirement and is instead used under the commerce clause "to apportion an out-of-state company's income among several states if and only if [a] nexus has already been established between a taxpayer and a taxing jurisdiction" (presumably under "the real economic substance test").

But the U.S. Supreme Court has never used the phrase "real economic substance" in a tax case, nor does it appear that the Maryland Court of Appeals formulated such a "test" in *SYL*, 375 Md. 78, 825 A.2d 399, the only tax case from any jurisdiction in which that phrase appears. Instead, the *SYL* Court merely applied the "unitary business" test and adopted the Tax Court's phrase "real economic substance" (or "substantial economic substance") to describe a subsidiary that does *not* exhibit "functional integration" and "centralization of management" with its parent. *See id.* at 99–100, 106–09, 825 A.2d 399. *See also Classics*, 189 Md.App. at 714, 985 A.2d 593 ("The Court of Appeals [in *SYL*] did not adopt a 'two prong sham transaction' test but consistent with the trend in caselaw, looked to the economic substance, in terms of the practical effect of the transactions in question.").

The distinction that appellees draw between the "constitutional nexus" and the "unitary business principle" is relevant where there is some question as to whether *any* part of a unitary business has a sufficient nexus with the taxing state. But where, as here, a parent company undoubtedly has a requisite nexus, the only question is whether the subsidiary partakes in the parent's unitary business; if so, it inherits the

We have recently held that a nexus sufficient to justify taxation arises from the economic reality that a parent's business in the taxing state produces a subsidiary's income. *Classics Chi., Inc. v. Comptroller of the Treasury,* 189 Md. App. 695, 715–16, 985 A.2d 593 (2010) (citing *Geoffrey, Inc. v. S.C. Tax Comm'n,* 313 S.C. 15, 437 S.E.2d 13 (1993); *Comptroller of Treasury v. Armco Export Sales Corp.,* 82 Md.App. 429, 572 A.2d 562 (1990)). The holding in *Classics* is a plain and logical application of the unitary business principle, and it fits squarely with this case. Gore generated income in Maryland and deducted payments to GEH and FVI, which recognized those payments as their income—an accounting identity that reflects their unified business. Appellees have not pointed us to any cases reaching the opposite conclusion, and even if this accounting identity is not sufficient, GEH and FVI demonstrate the "hallmarks" of a unitary business relationship under constitutional law: functional integration, centralized management, and economies of scale. GEH and FVI are dependent upon Gore for their core business functions, either by contractual arrangement or by the simple fact that they have common directors, executives, and employees. More importantly, to the limited extent that the subsidiaries are separated from Gore in theory or by corporate form, they remain under Gore's complete control and advance the parent's interests wholesale.[12] To do otherwise would violate the

---

parent's nexus, and the tests are effectively merged. *MeadWestvaco,* 553 U.S. at 25, 128 S.Ct. 1498 ("Where, as here, there is no dispute that the [parent] taxpayer has done some business in the taxing State, the inquiry shifts from whether the State may tax to what it may tax.... To answer that question, we have developed the unitary business principle."); *see SYL,* 375 Md. at 104, 825 A.2d 399 (in a parent-subsidiary case, the "three key elements necessary for constitutional nexus" are that the parent is engaged in business in Maryland, the parent is unitary with the subsidiary, and the apportionment formula is fair).

12. Appellees argue at length that Gore's heterarchical "lattice structure" was not suited to the functions that GEH and FVI undertake, and they introduced various expert witness testimony to that effect before the Tax Court. But none of those experts explained why the management structure governing GEH and FVI *required* the legal structure of separate corporate form. Nor does it appear there is such an explana-

very tenets of corporate law. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 101 (Del.2007) (even in bankruptcy, directors must "discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners" (citing *Guth v. Loft, Inc.,* 23 Del.Ch. 255, 270–71, 5 A.2d 503, 510 (Del.1939))). And though control will not establish a unitary business in every case, *see MeadWestvaco,* 553 U.S. at 30, 128 S.Ct. 1498 it suffices here, where the parent's expense in Maryland *is its subsidiary's income.*

We also reject GEH's contention that precedent concerning trademark holding companies, *e.g., Geoffrey, Inc. v. S.C. Tax Comm'n,* 313 S.C. 15, 437 S.E.2d 13 (1993), should not apply to GEH as a patent holding company. GEH argues that patents have a constitutional origin, while federal trademark jurisdiction is merely regulation of interstate commerce; GEH thus concludes that "states have leeway in their treatment of trademarks that does not exist relative to patents." But the fact that these two types of intellectual property have different origins in federal law does not affect *how* or *where* they are "used" for purposes of state income taxation, and GEH presents no authority to the contrary. Nor are we persuaded by GEH's characterization of a patent as a uniquely "negative" right that allows its owner "to prevent others from making, using, or selling" a product; trademarks operate in precisely the same manner, by *preventing* others from using a given

---

tion, given the near complete overlap between Gore and its subsidiaries in directorship and management. Moreover, there is no reason to hold that a different management style or structure renders these operations *independent* from their corporate parents, whether that structure is achieved internally through isolation from the general management structure, or externally through the corporate form. We have no doubt that various business functions require differing management approaches, but this does not make them independent businesses as a matter of law. In short, we would reach the same conclusion if GEH and FVI were not external corporations but were "business divisions" that Gore sought to isolate through geographical accounting. *See, e.g., Exxon Corp. v. Dep't of Revenue,* 447 U.S. 207, 219–27, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980).

mark. *See College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 673, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("The hallmark of a protected property interest is the right to exclude others."). The only difference between the two intangibles is that, as a matter of policy, the common law of trademarks—and now the Lanham Act—requires "use in commerce;" but as a practical matter this is simply to ensure that the mark has some *meaning* by attachment to particular goods, akin to a patent's claims. *See* Graeme W. Austin, *Tolerating Confusion About Confusion: Trademark Policies and Fair Use,* 50 Ariz. L.Rev. 157, 163 (Spring 2008) ("For a trademark to symbolize a firm's goodwill in goods or services, it is usually necessary for the mark to have impacted consumers' minds. Through use in commerce, the mark needs to have come to designate the source of a firm's goods or services." (footnotes omitted)).[13] Any theoretical distinction between "positive" and "negative" rights is a matter of semantics, and the Tax Court's holding does not, as GEH supposes, "frustrate the intent of the federal patent laws." The Tax Court merely applied the federal constitutional standards governing interstate taxation to income generated from these intellectual properties, in like manner.

Finally, as a practical matter, the tax treatment that appellees seek would have us ignore the fact that the "expenses" Gore deducts in Maryland are simultaneous *gains to assets on its own balance sheets,* namely, GEH and FVI. As such, it would defy logic to argue that those expenses are incurred in Maryland and yet the corresponding gains are somehow not realized in Maryland as part of a unitary business.[14]

---

**13.** A 1998 amendment to the Lanham Act expanded the common law by providing for "intent to use" trademark applications, which—predictably—require the applicant to specify "the goods in connection with which the applicant has a bona fide intention to use the mark." *See* 15 U.S.C. 1051(b)(2).

**14.** It would appear that Gore, Inc. could nullify any windfall by paying an appropriate amount of Maryland income tax on *dividends or capital*

██ In the alternative, appellees argue that the Comptroller is barred from recovering taxes from GEH and FVI because the statute of limitations has expired and because prior audits of Gore, Inc. "put the Comptroller on notice that Gore, Inc. made royalty payments to GEH." We disagree.

First, TG § 13–1101(b)(3) provides that income tax may be assessed at any time if a return is *not* filed as required under Title 7, Title 8, or Title 10 of that article. As our discussion has already shown, GEH and FVI had Maryland taxable income for each year of the Comptroller's assessments, and because they did not file returns as required by TG § 10–810(a), their assessments fall directly under the limitations exception in TG § 13–1101(b)(3).[15] *See Classics*, 189 Md.App. at 702 n. 2, 985 A.2d 593.

---

*gains from its subsidiaries* (*i.e.*, an amount reflecting the proportion of the subsidiaries' income deducted as expenses in Maryland and eventually returned to Gore, Inc. as dividends or capital gains). Assuming this could be done under Maryland tax law, neither GEH, FVI, nor the State appears to have considered this as an option; and for the reasons given above, it would be just that—*an option*. The companies formed a unitary business under long-standing principles of interstate taxation, where the "unitary business principle" appears as early as 1924, in *Bass, Ratcliff & Gretton, Ltd. v. State Tax Com.*, 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924), and has existed in its current form since at least 1980, *see MeadWestvaco*, 553 U.S. at 25–29, 128 S.Ct. 1498 (citing *Exxon Corp. v. Dep't of Revenue*, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980)). Taxing the parent's subsequent income does have a certain doctrinal appeal; rather than probe the factual depths of a case, it is simpler to ignore the subsidiary altogether and hold that deductions in one state that will inevitably return to a parent are, *ipso facto*, income generated in that same state. Ultimately, though, our holding—that a nexus sufficient to justify income taxation arises when a parent's expenses in the taxing state are a "foreign" subsidiary's income—achieves the same effect. We also surmise that it is significantly less complicated to account for a subsidiary's current income than to allocate some portion of the parent's future gain. But again, our discussion establishes that this is a policy choice left open by the Constitution, so that TG § 10–402 allows the Comptroller to assess tax *either* against the subsidiary or against the parent (but not both, which would amount to double taxation).

**15.** Appellees concede that prior Maryland cases have affirmed assessments of up to ten years. *See SYL*, 375 Md. at 81–82, 825 A.2d 399 (upholding a seven year assessment); *Classics*, 189 Md.App. at 698–99, 985 A.2d 593 (upholding a ten year assessment).

Second, GEH claims that general notions of due process bind the Comptroller because it did not assess these taxes in its prior audits of the parent, Gore, Inc.[16] We disagree, however, with appellees' fundamental assertion that "the Comptroller deprived GEH of the opportunity to timely address the issues" raised in this appeal. Even if the Comptroller was "on notice" of Gore's payments to GEH, there is no indication that Gore disclosed the full extent of its relationship with GEH. Furthermore, there is no authority making it the Comptroller's duty to investigate every expense payment to companies potentially related. If Gore and GEH had wanted to settle these issues when they first arose, they could have sought the Comptroller's opinion. By not doing so, it was *they* who deprived *themselves* of the opportunity to timely address the issues, not the Comptroller. Moreover, even if we were to take the Comptroller's prior silence as some sort of positive stance, the Court of Appeals long ago held that the Comptroller is not bound by positions taken in its audits. *Comptroller of Treasury, etc. v. Atlas General Industries,* 234 Md. 77, 86, 198 A.2d 86 (1964).

As the foregoing discussion has shown, GEH and FVI earned taxable income in Maryland during each year covered by the Comptroller's assessments. Neither company filed tax returns for those periods, and the Comptroller is not bound by its prior audits of Gore, so there is no reason to reject the Tax Court's assessments under the United States Constitution or Maryland's Tax Code.

## II.

Appellees next argue that the Tax Court erred when it applied Gore's apportionment factor to their incomes in order to calculate their tax obligations. The Supreme Court summarized judicial review of apportionment schemes in *Container Corp. of Am. v. Franchise Tax Bd.*:

---

16. The audits were completed before FVI was formed, and FVI therefore concedes that this argument does not apply to it.

Having determined that a certain set of activities constitute a "unitary business," a State must then apply a formula apportioning the income of that business within and without the State. Such an apportionment formula must, under both the Due Process and Commerce Clauses, be fair. The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not invalidate an apportionment formula whenever it may result in taxation of some income that did not have its source in the taxing State. Nevertheless, we will strike down the application of an apportionment formula if the taxpayer can prove by clear and cogent evidence that the income attributed to the State is in fact out of all appropriate proportions to the business transacted in that State, or has led to a grossly distorted result.

463 U.S. 159, 169–70, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (citations and quotation marks omitted).

▮▮▮ There is no dispute that, if applied by every jurisdiction, the Comptroller's apportionment is internally consistent and "would result in no more than all of the unitary business' income being taxed." *See Container Corp.*, 463 U.S. at 169, 103 S.Ct. 2933. However, GEH and FVI argue that the Comptroller's assessment is not "externally consistent" and that their income should be apportioned according to Gore, Inc.'s *sales* rather than any measure of its property or payroll. But if Gore's apportionment reasonably reflects its expenses in Maryland, and those expenses *are GEH's and FVI's income*, then the same apportionment factor reasonably reflects the proportion of income generated in Maryland as part of Gore's unitary business.[17] *See SYL*, 375 Md. at 82, 93, 109,

---

17. We note that TG § 10–402(d) and COMAR 03.03.03.08F(1) authorize alternative apportionment when statutory formulas do not "reflect

825 A.2d 399 (upholding assessments based on parent companies' apportionment factors). As such, the Tax Court did not err when it upheld the Comptroller's assessments.

**JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY REVERSED. COSTS TO BE PAID 50% BY GORE ENTERPRISE HOLDINGS, INC. AND 50% BY FUTURE VALUE, INC.**

clearly the income allocable to Maryland." The statutory apportionment that GEH and FVI propose would result in zero tax liability. For the reasons given in our discussion, this would not "reflect clearly the income allocable to Maryland," and as such, the Comptroller was not bound to the statutory apportionment.